THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BURDETTE WEHMEYER, Defendant-Appellant.

Second District No. 2—85—1050

Opinion filed May 27, 1987.

Robert R. Fuenty, of Gallagher, Fuenty & Klein, of De Kalb, for appellant.

Charles R. Hartman, State's Attorney, of Freeport (William L. Browers and Virginia M. Ashley, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Burdette Wehmeyer, and codefendant, Robert Gasoske, were jointly charged by information with battery and reckless conduct, stemming from corporal punishment inflicted by Gasoske, a teacher, on Scott Meyers, a sixth-grade student. Defendant was principal of the school and present when Gasoske physically disciplined Meyers. Defendant's bench trial and codefendant's jury trial were heard simultaneously. At the close of the State's case, the court entered a finding in favor of defendant on the reckless conduct charge. The jury found codefendant not guilty of battery but guilty of reckless conduct. The court then found defendant guilty of battery based on accountability. On November 26, 1985, defendant was placed on court supervision for one year, with the conditions that he not violate any penal statute or ordinance, pay the costs of the proceedings, and perform 100 hours of public service work. This appeal followed.

On appeal, defendant raises three issues for review: (1) whether defendant was proved guilty of battery under a theory of accountability beyond a reasonable doubt; (2) whether the trial court applied the correct standard of law in determining that defendant was accountable; and (3) whether codefendant's acquittal of battery by the jury raises a reasonable doubt as to defendant's conviction of battery by the trial judge.

At trial, Scott Meyers testified that on April 19, 1985, he was 12 years old and a sixth-grade student at the Pearl City Junior High

School located in Stephenson County. During Scott's fifth-hour mathematics class, his teacher, codefendant Robert Gasoske, discovered that Scott had cheated on a test by giving answers to a fellow student. As a consequence, Gasoske brought Scott and his companion to the principal's office and told the principal, defendant Burdette Wehmeyer, that the boys had cheated on a test. Gasoske determined that Scott would receive three detentions and be corporally punished, while the other student would receive three detentions. After the other student was sent back to class, Gasoske directed Scott to stand up next to the defendant's desk and bend over. Gasoske then struck Scott's buttocks 12 times with a paddle. Scott was advised that he would receive another 12 swats during the eighth school hour. Scott testified that he was crying while he was being paddled, and the paddling hurt. Scott added that he had never before felt such pain. After the paddling was administered, Gasoske accompanied Scott to his next class. Scott stated that during this class it hurt to sit down in a normal way. At his seventh-hour class Scott's buttocks still hurt, but not as much as before. At the beginning of the eighth hour, Gasoske brought Scott to the principal's office, where another 12 swats were administered in the same manner as before. Once again, Scott testified that he was crying and the paddling hurt. Gasoske also gave Scott detention papers, which were to be taken home and signed by his mother. Thereafter, Scott returned to his eighth-hour class. Scott admitted on cross-examination that he did not tell his sixth- or seventh-hour teachers that he had problems sitting at his desk, nor did he complain to his eighth-hour teacher that he was hurting because of the swats he received. He also testified that he was not crying when he returned to class after receiving the first 12 swats, although he did have tears in his eyes during the eighth hour.

After school, Scott went home to his mother's house. He did not give the detention papers to his mother because he believed that she would get angry at him if she learned he had received detention. Scott spent the weekend at his father's home, where he played baseball, went for walks, and engaged in other activities. Scott did not tell his father about the paddling incident.

On Monday morning before school, Scott gave the detention papers to his mother to sign; however, she refused to sign them. When Gasoske learned that the detention papers were not signed, he advised Scott that another detention would be added on and 48 swats would be administered after school. Scott did not stay after school as ordered by Gasoske because he did not want to be hit again. Instead, Scott went home and for the first time told his mother what had hap-

pened the previous Friday.

Shortly thereafter, Gasoske telephoned and spoke with Scott's mother. Scott then returned to school and wrote a three-page paper on cheating. Scott's mother then transported Scott to a doctor to be examined. Scott and his mother then went to the sheriff's office. The next day, a detective took photographs of the affected area of Scott's buttocks, which were later introduced into evidence.

Shirley Meyers, Scott's mother, stated that on Monday, April 22, 1985, Scott returned from school and was very upset. Scott related the incident of the previous Friday and showed his mother his buttocks, which were black and blue. Shortly afterwards, Mrs. Meyers received a telephone call from Gasoske, who inquired why Scott did not stay for his detention after school. Mrs. Meyers told Gasoske that Scott was afraid to go to his detention and related that she had observed Scott's buttocks. Mrs. Meyers notified Gasoske that she would bring Scott to the detention period, but that Gasoske was not to touch him. She testified that Gasoske admitted he had gotten carried away and assured her he would not touch Scott. After the detention, Mrs. Meyers brought Scott to the doctor's office for a checkup. Thereafter, she took Scott to the sheriff's department. The bruises that Mrs. Meyers observed on April 22 had disappeared by the following weekend, and Scott did not suffer any problems as a result of the incident.

Prior to the incident on April 19, Mrs. Meyers had received notices from the defendant indicating that corporal punishment had been administered to Scott. Mrs. Meyers talked to Scott about the circumstances surrounding the punishment; however, she did not attempt to contact the defendant or any other teacher to discuss the situation. Mrs. Meyers knew that Scott was having disciplinary and academic problems in school, and she expected the teachers to discipline him when necessary. Mrs. Meyers had not been informed that a wooden paddle was used to strike Scott. Instead, Mrs. Meyers believed that the swats she was advised of were actually spankings with an open hand on Scott's buttocks. Mrs. Meyers was aware that the Pearl City School District had in effect a policy allowing the use of corporal punishment. She also knew that if she did not want her child to be subject to corporal punishment, she merely had to sign a note indicating that its use was prohibited. Mrs. Meyers admitted she did not elect to prohibit the use of corporal punishment.

Dr. James Haigh, a pediatrician, testified that Scott Meyers was a patient of his and he examined Scott on April 22, 1985, at the Freeport clinic. Dr. Haigh observed two large, fairly fresh, purplish bruises on Scott's buttocks. In Dr. Haigh's opinion, the bruises were caused

by a series of acts involving a great deal of force. At the time of the examination, Scott was 58 inches tall and weighed between 85 and 90 pounds. No X rays or other diagnostic tests were conducted as they were determined by Dr. Haigh to be unnecessary. Dr. Haigh further stated that while some children bruise more easily than others, Scott did not fit in that category.

After the State rested, defendant moved for a directed finding on both charges. The motion was granted on the reckless conduct charge, but denied on the battery charge.

Defendant, Burdette Wehmeyer, testified that since 1973 he had been the elementary and junior high principal at the Pearl City community school. As principal of the school, defendant stated that one of his duties was to enforce the disciplinary regulations at the school. The school board had adopted provisions for the use of corporal punishment which were sent to parents at the beginning of every school year. The school board policy did not set a limit on the extent of corporal punishment permissible, although a certified employee was required to act as a witness. Provisions further provided that parents could direct the school not to administer corporal punishment to their child by writing a letter to the principal.

Each principal in the school district was permitted to establish procedures to carry out the school board policy. Defendant testified that under his system, the teacher and student were to report to his office and engage in a consultation on the matter in his presence. The decision to inflict corporal punishment rested with the teacher, although defendant said he could tell a teacher not to use corporal punishment if he felt it was uncalled for. Defendant usually acted as the certified employee witness as required by the school board policy. After each corporal punishment, notification of the punishment administered was sent to the student's parents.

On Friday, April 19, 1985, codefendant Gasoske brought Scott and another student to defendant's office. Gasoske and the students discussed the aforementioned cheating incident in defendant's presence. After the discussion, the other student was excused from the office. Gasoske told Scott to remove any objects from his rear pockets and then swatted Scott's buttocks 12 times with a paddle. The paddle, an oak board 18 to 19 inches long, 4 inches wide, and three-fourths of an inch thick, had previously been brought to defendant's office by Gasoske and was kept in a storage cabinet within the office. Gasoske used a hand and wrist motion to administer the swats, and the paddle traveled back and forth approximately 12 to 18 inches. Scott did not cry or express any pain, although defendant did observe a puddling of

tears in Scott's eyes immediately after the 12 swats were administered. Gasoske did not appear to be angry or acting with vengeance; rather, he appeared to be calm and collected during the incident. After the swats were administered, Scott went to his sixth-hour class. During the eighth-hour class, Gasoske and Scott returned and Gasoske administered an additional 12 swats in the same manner as before. Defendant did not believe that Scott was injured, and Scott gave no indication to the contrary. Defendant stated there was no intention to injure Scott and if he had believed Scott was being injured, he would have stopped the paddling. Defendant was surprised and shocked when he first learned of Scott's bruises the following Tuesday morning. Outside the presence of the jury, defendant testified that he believed it would be unreasonable to knowingly inflict marks like those suffered by Scott. Defendant acknowledged that he had the option of expelling Scott from school or suspending him out of school for a period of 1 to 10 days, but did not utilize those alternatives because he felt they were inappropriate.

Defendant was aware that Scott was having disciplinary problems with several teachers and had received corporal punishment on previous occasions from Gasoske and David School, another of Scott's teachers. The first time Gasoske administered corporal punishment on Scott he swatted him three times; the second occasion, six times; and the third session, 12 times. On the latter occasion, Scott was swatted six times during his fifth-hour class and six times during his eighth-hour class. Defendant explained that the punishment was split up so that Scott would be able to return to class without being so upset that he could not resume normal academic activities. The fourth time Gasoske struck Scott was the incident that precipitated the present litigation. School had corporally punished Scott on one occasion wherein he administered five swats. Each time Scott was subjected to corporal punishment, notification of the punishment administered was sent to Mrs. Meyers. Defendant added that each of Scott's teachers had their own particular discipline plan and that some plans worked better than others.

Codefendant, Robert Gasoske, testified that he had been a teacher at the Pearl City school for 14 years. Gasoske first met Scott Meyers in December 1984 when Scott was assigned to his mathematics class. At that time Gasoske gave Scott a copy of the classroom rules, which he expected Scott to abide by. On December 13, 1984, Scott was among four students who failed to complete a homework assignment, and the four students were taken to defendant's office for a conference. A letter was sent to Mrs. Meyers informing her of Scott's fail-

ure to complete assigned work and indicating that in the future Scott would receive three swats each time he failed to do something that he was supposed to do. Mrs. Meyers signed the note and returned it to Gasoske. Defendant was aware of the letter sent to Mrs. Meyers. Gasoske did not tell Mrs. Meyers that his normal procedure was to increase the swats administered geometrically, although Gasoske did tell Scott about this policy. On December 14, Gasoske had a telephone conversation with Mrs. Meyers in which she stated that she was at a loss as to what to do with Scott. On December 17, Scott was involved in a commotion in the school hallway, and as a result Gasoske administered three swats. On January 15, 1985, it was again necessary to discipline Scott and six swats were inflicted. On January 30, defendant informed Gasoske that Scott had not completed his homework in three of his other classes. Gasoske confirmed the defendant's information with the three other teachers and thereafter swatted Scott 12 times.

Regarding the incident on April 19, Gasoske's testimony was substantially similar to defendant's. Gasoske added that before each swat, Scott would arch his body a little bit in anticipation. In addition, Gasoske warned Scott not to try to block the blows with his hand because Gasoske did not want to be responsible for breaking a finger. Gasoske noticed tears in Scott's eyes but did not notice any uncontrollable sobbing or crying. Scott did not say anything during the time the swats were administered and did not appear to have any difficulty walking to his sixth- or eighth-hour classes.

As to the events on the following Monday, Gasoske's testimony was consistent in most respects with the testimony of Scott and Mrs. Meyers. Gasoske confirmed that he told Scott he would receive 48 swats after school for failing to have his mother sign the disciplinary slip. Gasoske stated that he first learned about Scott's bruises when he talked to Mrs. Meyers on the telephone. Gasoske denied telling Mrs. Meyers that he may have gone overboard in administering corporal punishment to Scott.

Rebecca Steinbeck testified that she was an English teacher at the school from August 1984 until May 1985. Scott Meyers was a pupil in her sixth-hour English class, and on April 19, 1985, she observed Scott when Gasoske brought him to the classroom. At that time, she observed that Scott's eyes were red, but Scott did not appear to be experiencing any physical discomfort. Steinbeck frequently had problems with Scott's not completing his assignments and, as a result, had to implement disciplinary procedures. Steinbeck stated that in the community defendant enjoys a very good reputation as an

administrator, principal, and teacher and has a reputation as a peaceful and quiet person.

David School testified he had been a teacher in the Pearl City school for the past seven years. During the 1984-85 school year, Scott Meyers was a member of School's homeroom class and eighth-hour study hall. On April 19, 1985, Scott arrived late and was accompanied by Gasoske. Scott made no complaints of pain or injury, and School did not observe any signs or indications that Scott was in pain or that anything was unusual. School stated that Gasoske was thought of as a conscientious teacher, who provided a good, quiet classroom setting. School added that defendant is thought of as a very competent, caring principal and administrator, who seldom raises his voice and is a peaceful and law-abiding man. School acknowledged that he administered corporal punishment to Scott on one occasion by striking Scott five times with a wooden paddle.

The jury hearing codefendant's case returned a not guilty verdict on the battery charge and a guilty verdict on the reckless conduct charge. Subsequently, the trial judge found defendant guilty of battery on an accountability theory.

In reaching his determination of guilt, the trial judge made lengthy findings of fact and law. A summary of the court's findings follow. The court first stated that two questions were at issue: Did a battery occur and was defendant guilty of accountability for battery? As to the first question, the court found that codefendant acted knowingly; it was unreasonable to strike a 12-year-old child 24 times with a paddle in view of the size of the paddle, the size of the child, the impact of the blows, and the number of blows; and bodily harm was established based on Scott's reaction to the blows and the severe bruising that resulted. In addressing defendant's accountability, the court found that defendant intended the punishment (i.e., battery) to occur based on the paddle's being kept in his office, his presence during the infliction of the punishment, his knowledge of the letter of agreement sent to Mrs. Meyers, his notification to Gasoske that Scott was having other disciplinary problems, and his awareness that by telling Gasoske of the additional problems, Scott would receive further corporal punishment. The court also found that defendant actively participated in the offense by deciding that the swats would be divided into two sessions, thereby indicating a conscious knowing on the part of the defendant that what was being done was excessive. The court concluded that defendant's conduct demonstrated that defendant aided and abetted Gasoske in the punishment given and intended to promote and facilitate the commission of the punishment.

On appeal, defendant first argues that he was not proved guilty beyond a reasonable doubt because the punishment inflicted was not unreasonable and, even assuming it was, the State failed to prove beyond a reasonable doubt that defendant was accountable for codefendant's conduct. Regarding the reasonableness of the punishment, defendant argues the punishment was not unreasonable in view of the following facts: (1) Scott did not cry uncontrollably; (2) codefendant had Scott remove items from his back pockets before striking him; (3) Scott had no difficulty walking or attending class after the two paddlings; (4) a short hand and wrist motion was used to inflict the blows; (5) codefendant was calm and collected during the incident; and (6) codefendant stated that he did not intend to injure or unreasonably punish Scott. The State argues in response that the trial court's finding that codefendant committed a battery is supported by the evidence. The State relies on the testimony of Dr. Haigh regarding the severity of the bruises, the size of the paddle used, the number of blows inflicted, and Scott's testimony that he cried and was in a great deal of pain.

■ "A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual ***." (Ill. Rev. Stat. 1985, ch. 38, par. 12—3(a).) In the context of a teacher's use of corporal punishment, our supreme court has stated that to be legally justified, corporal punishment must be reasonable. In determining whether a particular punishment is without legal justification, the trial court should apply a reasonableness standard. (*People v. Ball* (1974), 58 Ill. 2d 36, 40, 317 N.E.2d 54.) In the present case, the trial judge applied a reasonableness standard and in our opinion correctly determined that the codefendant's conduct was unreasonable. We also believe there was a sufficient basis to support the court's finding that codefendant acted knowingly and caused bodily harm.

■ The facts relied on by defendant in support of his argument that codefendant did not commit a battery are unpersuasive. More important than the reactions of the student and the self-serving testimony of a teacher is the manner and form of the punishment. Here, a large solid oak paddle was used to administer a total of 24 blows to a 12-year-old child standing 58 inches tall and weighing 85 to 90 pounds. Indicative of the force of each blow was codefendant's admonishment to Scott that he refrain from attempting to block the blows because codefendant did not want to risk breaking Scott's fingers. Finally, the severe bruising of Scott's buttocks, as testified to by Dr. Haigh and graphically illustrated in the photographs admitted at

trial, further indicates the harsh nature of the punishment inflicted by codefendant. Based on these circumstances, we find the defendant's argument that the trial court erred in determining that codefendant committed a battery to be unpersuasive.

■■ ■ Defendant further argues that even if we find that a battery was committed, the State did not prove beyond a reasonable doubt that defendant was accountable for the battery. In support of this argument, defendant asserts that he did not actively participate in the offense and did not specifically intend that a battery be committed. Section 5—2 of the Criminal Code of 1961 states in pertinent part:

> "A person is legally accountable for the conduct of another when:
>
> * * *
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).)

To · hold a defendant accountable, the State must establish: (1) that defendant solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) defendant's participation occurred either before or during the commission of the offense; and (3) defendant specifically intended to promote or facilitate the commission of the offense. (*People v. Bell* (1981), 96 Ill. App. 3d 857, 864, 421 N.E.2d 1351; *People v. Daniels* (1978), 67 Ill. App. 3d 663, 669, 384 N.E.2d 932.) Mere presence at the scene of the offense or negative acquiescence in another's action is insufficient evidence to establish accountability. (*People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 655, 493 N.E.2d 135; *People v. Watson* (1982), 106 Ill. App. 3d 315, 317, 436 N.E.2d 7.) However, if the defendant was present at the crime scene without disapproving or opposing it, the trier of fact may consider such conduct together with other circumstances in concluding that defendant assented to the commission of the offense and thereby aided and abetted the crime. *People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 656, 493 N.E.2d 135; *People v. Cleveland* (1986), 140 Ill. App. 3d 462, 469, 488 N.E.2d 1276.

■ In reviewing defendant's contention that the evidence presented at trial was insufficient to support his battery conviction based on an accountability theory, we are required to view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt. (*People v. Saldana* (1986), 146 Ill. App. 3d 328, 334, 496 N.E.2d 757.) A trial court's finding of accountability will not be set aside on review unless the evidence is so improbable, unsatisfactory, or unreasonable so as to raise a reasonable doubt of guilt. *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 11, 460 N.E.2d 847.

■ In the present case, there is ample evidence supporting the trial court's finding that defendant was accountable for codefendant's conduct. The defendant was responsible for enforcing discipline at the elementary and junior high school. He was aware of Scott's disciplinary problems and involved in the disciplinary plan formulated for Scott by codefendant. As to the particular incident at hand, both punishments occurred in defendant's office with defendant acting as a witness. Defendant at no time opposed the conduct of codefendant and made no attempts to curb codefendant's actions. Furthermore, defendant actively participated in the offense by deciding the blows should be split up and administered at separate times. These circumstances demonstrate beyond a reasonable doubt that defendant was accountable for the criminal conduct committed by codefendant.

■ Defendant next argues that the trial court failed to find that he specifically intended unreasonable punishment to occur as required by the accountability statute. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2.) According to defendant, the court's finding that defendant acted knowingly was insufficient to render him accountable. Defendant's argument addresses the third requirement of paragraph (c) of the accountability statute, *i.e.*, defendant must have had the concurrent, specific intent to promote or facilitate the commission of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c); *People v. Daniels* (1978), 67 Ill. App. 3d 663, 669, 384 N.E.2d 932.) To satisfy this requirement, the State must establish beyond a reasonable doubt that defendant shared the criminal intent of the principal or was engaged in a common design. (*People v. Bolden* (1978), 59 Ill. App. 3d 441, 447-48, 375 N.E.2d 898; *People v. Hill* (1977), 53 Ill. App. 3d 280, 284, 368 N.E.2d 714.) The mental state necessary to prove battery is intent or knowledge. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—3, 4—4, 4—5.) Defendant acknowledges that the court found that he and codefendant acted knowingly, and the record supports this finding. Moreover, the court specifically found that defendant aided and abetted codefendant with the intent to promote and facilitate the commission of the offense. We conclude therefore that defendant's argument is without merit.

Defendant finally contends that since the evidence presented at

the joint bench/jury trial was identical, the jury's finding of not guilty on codefendant's battery charge creates a reasonable doubt of guilt as to defendant's battery conviction. Defendant relies on *People v. Beasley* (1976), 41 Ill. App. 3d 550, 353 N.E.2d 699, and *People v. Carter* (1974), 19 Ill. App. 3d 21, 311 N.E.2d 213, as authority for his argument. In *Beasley* and *Carter*, the defendants were convicted of burglary and murder, respectively, on the basis of accountability while their codefendant/principals were found not guilty on the same charges following joint bench/jury trials involving identical evidence of guilt. Both courts concluded that "[w]here co-defendants are tried on the same facts, the verdicts should be consistent" otherwise a reasonable doubt exists as to the finding of guilt. *People v. Beasley* (1976), 41 Ill. App. 3d 550, 555, 353 N.E.2d 699; *People v. Carter* (1974), 19 Ill. App. 3d 21, 23, 311 N.E.2d 213.

The State responds that the evidence presented was not identical as to each defendant's mental state and, therefore, the verdicts were not inconsistent. Alternatively, the State argues that *Beasley* and *Carter* were incorrectly decided and should not be followed by this court.

Initially, we agree with defendant that the evidence presented was identical for purposes of resolving this issue. As in *Beasley* and *Carter*, the same transaction was involved and the evidence of guilt of the codefendant/principal was at least as great as the evidence presented against the defendant who was tried on an accountability theory. We proceed on the premise that the evidence presented against each defendant was identical.

 Generally, in a joint trial before the same trier of fact the acquittal of a codefendant raises a reasonable doubt as to the defendant's guilt where the evidence presented against each defendant is identical in all respects. (*People v. Stock* (1974), 56 Ill. 2d 461, 465, 309 N.E.2d 19; *People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 656, 493 N.E.2d 135.) Conversely, where codefendants are tried separately before different triers of fact, the acquittal of one codefendant does not have any bearing on the guilt of a codefendant regardless of the nature of the evidence presented. (*People v. Gharst* (1984), 122 Ill. App. 3d 1, 5, 460 N.E.2d 813; *People v. Schroeder* (1982), 105 Ill. App. 3d 677, 680, 434 N.E.2d 546.) Part of the reason for this distinction is that the attitudes of each trier of fact may differ, which could result in conflicting resolutions of factual disputes and credibility assessments. *People v. Gharst* (1984), 122 Ill. App. 3d 1, 5-6, 460 N.E.2d 813.

The present case falls within the boundaries of the joint trial/same

trier of fact and the separate trial/different triers of fact lines of cases. Here, a joint trial with different triers of fact was conducted. Defendant correctly points out that in *Beasley* and *Carter* the Appellate Court for the Fifth and First Districts determined that in such circumstances, the acquittal of one defendant is inconsistent with finding the other defendant guilty and thereby raises a reasonable doubt of guilt. The rationale supporting these conclusions is scant, aside from the perceived inappropriateness of such a result.

In our opinion, focusing solely on the perceived inappropriateness of such a result begs the critical question of whether sufficient evidence was presented to support the conviction entered by the trier of fact chosen by defendant. The determination of a separate trier of fact as to a codefendant's guilt or innocence has no bearing on this question. Each trier of fact weighs the evidence, assesses the credibility of the witnesses, and applies the pertinent law on the basis of its preconceived attitudes and experiences. Provided the trier of facts' determination is reasonable and supported by the evidence, we see no reason why the determinations of separate triers of fact following a joint trial require absolute consistency. In this regard, one trier of fact may be more lenient than another and enter a conviction for a lesser offense or only on one offense instead of two despite support in the evidence for both convictions. (*People v. Hobson* (1979), 77 Ill. App. 3d 22, 27, 396 N.E.2d 53.) In view of these considerations, we hold that where codefendants are jointly tried before a judge and a jury on the same facts, the verdicts rendered need not be consistent. We decline to follow the contrary decisions in *People v. Beasley* (1976), 41 Ill. App. 3d 550, 353 N.E.2d 699, and *People v. Carter* (1974), 19 Ill. App. 3d 21, 311 N.E.2d 213.

Finally, we note that the codefendant's acquittal of battery does not preclude defendant's battery conviction based on accountability. Ill. Rev. Stat. 1985, ch. 38, par. 5—3.

For the foregoing reasons, the judgment of the circuit court of Stephenson County is affirmed.

Affirmed.

REINHARD and UNVERZAGT, JJ., concur.