*In re* F.W. *et al.,* Minors (The People of the State of Illinois, Petitioner-Appellee, v. Julia West, Respondent-Appellant).

Fourth District    No. 4—93—0818

Opinion filed May 13, 1994.

J. Stephen Beckett, of Beckett & Associates, P.C., of Urbana, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Rita J. McPheron, of Urbana, guardian *ad litem.*

JUSTICE KNECHT delivered the opinion of the court:

Julia West appeals from the order of the circuit court of Champaign County finding her daughter, F.W., to be a neglected minor. (Ill. Rev. Stat. 1991, ch. 37, par. 802—3.) We find no error and affirm.

West is the mother of T.W., born August 5, 1977, and F.W., born June 6, 1979. West is the grandmother of T.W.'s child, C.W., born October 18, 1991. In January 1993, T.W. was in the custody of the Youth Correctional Center in Warrenville, Illinois. F.W. and C.W. resided with West. On January 18, 1993, after investigating a report West had abused F.W., the State filed a petition alleging F.W. and

C.W. to be neglected and abused minors (Ill. Rev. Stat. 1991, ch. 37, par. 802—3), and alleging C.W. to be a dependent minor.

At the adjudicatory hearing on May 28, 1993, the court took judicial notice of West's testimony at the shelter-care hearing. There, West testified T.W. became pregnant at the age of 13. Thereafter, West became fearful she had not been as observant as she should have been, and she wanted to "keep better tabs" on F.W. On January 17, 1993, F.W. went skating without permission. When she returned, West scolded her for doing so. During this conversation, West additionally addressed other topics, including F.W.'s recent suspension from school and whether F.W. had been going to Planned Parenthood. F.W. was not responsive, so West began "pushing on her." F.W. started "running off at the mouth." West continued "pushing on her," and then picked up a board and swung it "not to hit [F.W.] or damage her or anything, but to let her know, to try to like scare her to get her on the right track." West acknowledged threatening F.W. with the board was a poor decision. The following testimony was also received at the adjudicatory hearing.

Jacqueline Ward, a child welfare specialist with the Department of Children and Family Services (DCFS), testified she became professionally involved with the West family on January 18, 1993. F.W. told Ward she and West had gotten in an argument because she had gone skating without permission and because West believed F.W. had taken money from C.W.'s bank. F.W. told Ward that usually West uses her fists to hit F.W. This time, however, West hit F.W. with a board. Ward observed a knot on F.W.'s arm and gashes on her leg.

Ward testified West admitted hitting F.W. on the shoulder "to get [F.W.] to shut up." When F.W. continued talking, West picked up a board and swung it. West acknowledged she may have hit F.W. with the board. West showed Ward the board, which was 24 inches long and four inches wide and had two metal brackets protruding from it.

William Gordon, who is also a child welfare specialist, testified regarding his involvement with the West family. In May 1989, Gordon investigated a report West hit T.W. with a plastic baseball bat, leaving bruises; the report was ultimately indicated. T.W. and F.W. reported West used physical methods of discipline almost daily, and hit them with a variety of objects, including ball bats, broomsticks, extension cords, and rope. F.W. also told Gordon West kept a three-foot-long board in the home and had threatened to throw it at T.W. West acknowledged using the plastic bat to threaten and "tap" the children. She also admitted using a vinyl belt, a broom, a mop, or

whatever was handy to discipline the children. West denied this "discipline" constituted abuse. West showed Gordon one of her own childhood scars which occurred as the result of being hit by her mother with an extension cord. She did not believe her mother had abused her. Rather, she believed her mother was merely trying to teach her what was right.

F.W. testified *in camera*. F.W. testified West generally disciplined her with an open hand, and had not recently hit her with objects. F.W. explained she lied earlier when she said West hit her with the board. She fabricated the story because she wanted to stay at a crisis center for a couple days. On cross-examination, F.W. acknowledged in the weeks immediately prior to the hearing, her relationship with West had improved and West had been buying "nice things" for her.

At the close of the hearing, the guardian *ad litem* (GAL) stated he believed it was clear C.W. was without a legal guardian and, therefore, a dependent minor. The GAL also stated the State had proved the existence of an injurious environment. The guardian stated "I think [West] was raised this way and she has no concept of the idea it's wrong to physically hit children to keep them in line." The GAL did not believe this had been an isolated incident, and did not believe West would participate in services necessary to rectify the situation, unless ordered to do so. The GAL noted F.W.'s changed story and stated he believed F.W. was afraid and was trying to keep her family together and is "willing to endure whatever comes along in order to do that." West's attorney argued the case involved only a permissible exercise of corporal punishment.

The court noted it was frightening West did not believe her parents had improperly disciplined her when they hit her with an extension cord causing scars which are still visible. With respect to F.W.'s testimony, the court stated "I have to believe that either [F.W.] lied then or she lied under oath today. Either way, I can't really say her testimony is adequate to establish anything by a preponderance." The court noted West admitted brandishing and swinging the board while threatening F.W., and stated this conduct had to be viewed in context of the "times in this family when objects were used to discipline children." Finally, the court expressed its concern regarding the lessons West taught her children through her methods of "discipline." The court noted such conduct:

> "teaches the child a very, very dangerous thing. After all, if it's okay for my mother to pick up a piece of a bed frame from time to time and wave it around my head and threaten to hit me with it, then why isn't it alright when I'm out on the street or I'm at school and somebody gets in my face, to pick up the nearest object

and threaten them with it? What's the difference? *** The problem is, she does it to somebody else and they call it Aggravated Assault, and the next thing she knows she's sitting in the detention center or with her sister at the Department of Corrections."

The trial court found C.W. was a dependent minor. The trial court additionally found both C.W. and F.W. were neglected as their environment is injurious to their welfare when they reside with West.

The dispositional hearing was held on August 25, 1993. At the hearing T.W.'s attorney represented T.W. would be released from the Youth Correctional Center in September 1993 and she intended to return to West's home. A dispositional report prepared by a DCFS child welfare specialist II was considered by the court. This report indicated West does not take responsibility for her own actions, including the physical abuse of her children. West also does not hold her daughters responsible for their actions. West refused to attend parenting classes, counseling, and sessions with a family aid specialist. She additionally refused to sign necessary releases and to disclose the name of the man she intended to marry. According to the report, F.W. appeared to be minimizing the abuse in an attempt to remain in West's custody.

The trial court stated it would not prevent T.W. from returning to West's home; however, West's failure to cooperate with DCFS would probably prevent her from retaining custody of F.W. and C.W. The court ordered custody of F.W. and C.W. to be removed from West and T.W. and appointed DCFS as their guardian.

West appeals from the finding F.W. is a neglected minor. The court found F.W. to be a neglected minor because her environment is injurious to her welfare when she lives with West. (Ill. Rev. Stat. 1991, ch. 37, par. 802—3(1)(b).) The court found the environment to be injurious as the result of physical abuse and neglect. In general, neglect is the failure to exercise the care the circumstances justly demand. It embraces wilful as well as unintentional disregard of duty. Given the varying circumstances of neglect cases, the circuit court must have broad discretion to reach a just determination. Only where there has been an abuse of discretion or the judgment is against the manifest weight of the evidence should the decision be disturbed on appeal. *In re Stilley* (1977), 66 Ill. 2d 515, 520, 363 N.E.2d 820, 822.

West alleges the trial court's ruling is against the manifest weight of the evidence. West contends there was no evidence "the decision to swing the board in the presence of F.W. was other than a decision to use the threat of corporal punishment." West claims she "had every

right as a parent to be concerned about maintaining control and discipline over F.W., and her use of corporal punishment or threat of corporal punishment did not and should not constitute neglect within the meaning of the Juvenile Court Act."

A parent's "right" to corporally punish his or her child is derived from the right to privacy, which is viewed as implicit in the United States Constitution. This right to privacy encompasses the right to care for, control, and discipline one's own children. "Discipline" had been interpreted by the courts to extend to *reasonable* corporal punishment. A parent who utilizes corporal punishment exceeding the boundaries of reasonableness may, depending on the circumstances, be subject to prosecution for cruelty to children (Ill. Rev. Stat. 1991, ch. 23, par. 2368), simple battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—3), domestic battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—3.2), aggravated battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—4), aggravated battery of a child (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.3), or reckless conduct (Ill. Rev. Stat. 1991, ch. 38, par. 12—5). Additionally, the child may be found to be a neglected minor as the result of an environment injurious to the child's welfare (Ill. Rev. Stat. 1991, ch. 37, par. 802—3(1)(b)), or an abused minor as the result of the infliction of excessive corporal punishment. Ill. Rev. Stat. 1991, ch. 37, par. 802—3(2)(v).

Implicit in West's argument, *i.e.*, she was within her "rights" to utilize a board to corporally punish F.W., is the assumption that utilizing a board for such purposes falls within the boundaries of reasonableness. West cites *In re Aaronson* (1978), 65 Ill. App. 3d 729, 382 N.E.2d 853, in support of her position.

In *Aaronson*, a father appealed the trial court's finding the children's environment was injurious to their welfare. The trial court's finding was based upon several factors, including beatings administered by Aaronson. Aaronson was alleged to have disciplined his children by striking them on the buttocks with a belt and a board. Reversing, the Third District Appellate Court found there was little evidence the "so-called 'beatings'" had been administered for other than disciplinary reasons. (*Aaronson*, 65 Ill. App. 3d at 731, 382 N.E.2d at 855.) Referencing *Ingraham v. Wright* (1977), 430 U.S. 651, 51 L. Ed. 2d 711, 97 S. Ct. 1401, in which the Supreme Court held a school official's "paddling" of students in public schools did not violate the eighth amendment, the third district concluded "[c]ertainly, paddling one's own children cannot be the basis of a charge of child abuse and neglect in the absence of clear evidence the paddling was vicious or for other than disciplinary reasons." *Aaronson*, 65 Ill. App. 3d at 731-32, 382 N.E.2d at 855.

The *Aaronson* decision is predicated upon the logic that if it is proper for a teacher to "paddle" a student with a board, then it must also be proper for a parent to "paddle" his or her own child with a board. However, we do not believe *Ingraham* may properly be relied upon to support the propriety of "paddling" a child with a board or other object. This is because in *Ingraham*, the court did not rule upon the *propriety* of such action, it merely determined the "paddling" of students by teachers was not a *constitutional* issue.

In *Ingraham*, students challenged a school district's policy of disciplining students by paddling them with a flat wooden paddle less than two feet long, three to four inches wide and one-half inch thick. (*Ingraham*, 430 U.S. at 656, 51 L. Ed. 2d at 721, 97 S. Ct. at 1405.) At trial the testimony of 16 students suggested the discipline policy was exceptionally harsh. Specifically, James Ingraham, an eighth-grade student, was subjected to more than 20 "licks" with a paddle. The paddling was so severe he suffered hematoma, requiring medical treatment and was unable to attend school for several days. Roosevelt Andrews, a ninth-grade student, was paddled several times. On two occasions he was struck on his arms, once depriving him of the full use of his arm for a week. (*Ingraham*, 430 U.S. at 657, 51 L. Ed. 2d at 721-22, 97 S. Ct. at 1405.) The students alleged these paddlings violated the eighth amendment prohibition of cruel and unusual punishment. They additionally alleged the school district's failure to provide them with notice and an opportunity to be heard prior to the paddling violated the due process clause of the fourteenth amendment. *Ingraham*, 430 U.S. at 653, 51 L. Ed. 2d at 719, 97 S. Ct. at 1403.

The court ruled the eighth amendment applies only to those convicted of crimes. Accordingly, the court held the eighth amendment does not apply to the paddling of children as a means of maintaining discipline in public schools. (*Ingraham*, 430 U.S. at 664, 51 L. Ed. 2d at 725-26, 97 S. Ct. at 1408-09.) The court additionally held the failure to provide the students with prior notice and an opportunity to be heard did not violate their due process rights. (*Ingraham*, 430 U.S. at 682, 51 L. Ed. 2d at 737, 97 S. Ct. at 1418.) In reaching this determination, the court found significant the existence of safeguards against abuses—namely civil and criminal liability for improper corporal punishment. The court noted "[t]eachers and school officials are unlikely to inflict corporal punishment unnecessarily or excessively when a possible consequence of doing so is the institution of civil or criminal proceedings against them." *Ingraham*, 430 U.S. at 678, 51 L. Ed. 2d at 734, 97 S. Ct. at 1416.

In determining the eighth amendment does not prohibit the

paddling of school children, and the presence of other safeguards obviated the need for prior notice and a hearing, the Supreme Court did not rule upon the propriety of the paddling administered in that case. *Ingraham* should not be read as an official sanctioning of the practice of "paddling" children with a board or other object.

Moreover, a survey of the Illinois cases which have dealt with the use of a board or other object to corporally punish a child reveals a uniform unwillingness to find such conduct to fall within the realm of reasonableness.

In two Illinois cases involving a school official's paddling of a school child with a wooden paddle, the officials' convictions of battery were affirmed. (See *People v. Ball* (1974), 58 Ill. 2d 36, 317 N.E.2d 54; *People v. Wehmeyer* (1987), 155 Ill. App. 3d 931, 509 N.E.2d 605.) In *Ball*, in context of one of the "safeguards" referenced by the court in *Ingraham*, the Supreme Court of Illinois addressed the issue of a teacher's "paddling" of a student similar to the "paddling" in *Ingraham*. The teacher in *Ball* paddled a child 10 times with a wooden paddle which was two feet long, three inches wide and one-fourth inch thick. The child was examined by a physician, who testified it was one of the most severe paddling cases he ever observed. The child was treated with medicated ointments and bandages. (*Ball*, 58 Ill. 2d at 37, 317 N.E.2d at 55.) The teacher was convicted of battery by the trial court, which found the teacher inflicted corporal punishment more severe than the child's parents would have had a right to administer and the corporal punishment was more than a spanking, it was in fact a beating. (*Ball*, 58 Ill. 2d at 38, 317 N.E.2d at 55-56.) The supreme court affirmed his conviction of battery. *Ball*, 58 Ill. 2d at 40, 317 N.E.2d at 57.

Similarly, in *Wehmeyer*, the trial court rejected defendant's contention no battery occurred when a teacher paddled a student with a wooden paddle. The evidence showed the child had been paddled by a teacher with an oak board which was 18 to 19 inches long, four inches wide and three-fourths inch thick. (*Wehmeyer*, 155 Ill. App. 3d at 936, 509 N.E.2d at 608.) The teacher instructed the child not to try to block the blows with his hands because the teacher did not want to be responsible for breaking the child's fingers. (*Wehmeyer*, 155 Ill. App. 3d at 938, 509 N.E.2d at 609.) The child was hit 12 times with the board, then was allowed to attend two classes, and then returned and was hit an additional 12 times. Three days later the child was examined by a physician who observed two large, fairly fresh, purplish bruises on the child's buttocks. *Wehmeyer*, 155 Ill. App. 3d at 934, 509 N.E.2d at 606-07.

The teacher who administered the paddling and the principal

who witnessed it were charged with battery. Rejecting the principal's argument that no battery had been committed, the appellate court noted:

"Here, a large solid oak paddle was used to administer a total of 24 blows to a 12-year-old child standing 58 inches tall and weighing 85 to 90 pounds. Indicative of the force of each blow was codefendant's admonishment to Scott that he refrain from attempting to block the blows because codefendant did not want to risk breaking Scott's fingers. Finally, the severe bruising of Scott's buttocks, as testified to by Dr. Haigh and graphically illustrated in the photographs admitted at trial, further indicates the harsh nature of the punishment inflicted by codefendant. Based on these circumstances, we find the defendant's argument that the trial court erred in determining that codefendant committed a battery to be unpersuasive." *Wehmeyer*, 155 Ill. App. 3d at 940-41, 509 N.E.2d at 611.

Parents have also been subject to criminal liability as the result of their use of a board or other object to corporally punish their children. In *People v. Sambo* (1990), 197 Ill. App. 3d 574, 554 N.E.2d 1080, the appellate court rejected defendants' contention they were not proved guilty beyond a reasonable doubt of battering their daughter because their conduct was legally justified as being within the reasonable limits of parental discipline. The court noted the evidence was sufficient to find the parents hit the child with their hands, a plastic baseball bat and a belt, kicked her, threw liquor in her face, and pulled her hair. The court found such conduct is not within the realm of a reasonable exercise of parental discipline.

The court also rejected defendants' arguments their convictions of battery violate public policy based on their right to privacy in family decisions. It recognized parents have a general right to privacy in the manner in which they raise their children, including taking reasonable steps to discipline their children when necessary. However, the State also has a legitimate interest in the welfare of juveniles, including the interest in protecting juveniles from "unreasonable" parental discipline. (*Sambo*, 197 Ill. App. 3d at 587, 554 N.E.2d at 1088.) The court noted public policy does not condone the type of "discipline" in which the Sambos engaged. *Sambo*, 197 Ill. App. 3d at 587-88, 554 N.E.2d at 1088-89.

Similarly, in *People v. Reynolds* (1980), 91 Ill. App. 3d 683, 687, 415 N.E.2d 685, 688, the appellate court affirmed Reynolds' conviction of aggravated battery and cruelty to children as the result of his use of an electrical cord to "discipline" his child. In doing so, the court rejected Reynolds' argument he was within his rights as a parent to

administer corporal punishment to his child. (*Reynolds*, 91 Ill. App. 3d at 686-87, 415 N.E.2d at 688.) A similar argument was rejected in *People v. Tomlianovich* (1987), 161 Ill. App. 3d 241, 242-43, 514 N.E.2d 203, 204, where the court affirmed a mother's conviction of cruelty to children as the result of the paddling of her child with a wooden paddle. Likewise, in *People v. Johnson* (1985), 133 Ill. App. 3d 881, 884-85, 479 N.E.2d 481, 483-84, affirming a father's conviction of cruelty to children, the court noted the use of a whip-like instrument (an extension cord) to corporally discipline a child exceeded the boundaries of reasonable parental discipline and was "vicious and unreasonable." Finally, in *People v. Swanson* (1980), 84 Ill. App. 3d 245, 246-47, 405 N.E.2d 483, 484, defendant's conviction of reckless conduct was affirmed where he used a belt to corporally punish his child and some of the blows fell on the child's back and chest. The court rejected Swanson's argument his acts constituted no more than the reasonable discipline of the child. *Swanson*, 84 Ill. App. 3d at 246, 405 N.E.2d at 483-84.

The use of boards or other objects to corporally punish a child has also been found to constitute neglect or abuse. In *In re D.L.W.* (1992), 226 Ill. App. 3d 805, 811, 589 N.E.2d 970, 974, this court affirmed a finding a father had engaged in extreme and repeated cruelty and had physically abused his child by striking the child with an 18-inch-long board. Similarly, in *In re L.M.* (1989), 189 Ill. App. 3d 392, 398-99, 545 N.E.2d 319, 323-24, the court rejected a mother's contention her children were not neglected or abused. Relying on *Aaronson*, the mother contended the use of a belt to corporally punish her own children cannot be the basis of a finding of child abuse in the absence of clear evidence the striking was vicious. The court found the corporal punishment was vicious and unreasonable and exceeded the bounds of proper parental force. A similar argument was rejected by the court in *In re D.M.C.* (1982), 107 Ill. App. 3d 902, 905, 438 N.E.2d 254, 257, where the court affirmed a finding of neglect and abuse where the parents used a belt to corporally punish their child.

Corporal punishment as a method of discipline remains a controversial issue. It is not our function in an abuse or neglect proceeding to determine whether parents measure up to an ideal, but to determine whether the child's welfare has been compromised. Whether to employ corporal punishment as a means of discipline is a decision each parent must make for himself or herself. However, parents should understand a swat on a child's buttocks with an open hand and the "paddling" of a child with belts, boards, cords, or ropes are intrinsically distinct exercises of corporal punishment. The cases

reviewed above, and the dearth of cases finding striking with objects to be "reasonable," should put parents on notice. When allegations of neglect or abuse are levelled, parents using boards, belts, cords, or ropes as weapons to inflict corporal punishment may encounter an unwillingness on the part of DCFS and the courts to regard their conduct as reasonable.

In this case West has a history of hitting her children with objects. During the most recent incident, she hit F.W. with her hands and brandished and swung a two-foot board with protruding metal brackets while threatening F.W. West acknowledged she "may have" hit F.W. with the board; F.W. had physical injuries to her person. We recognize the physical consequences to F.W. of West's conduct are less than those suffered by the children in the cases discussed above. However, the degree of physical injury inflicted upon a child is not the exclusive or determinative factor in evaluating the reasonableness of the parental conduct. We are also concerned with the likelihood of future punishment which may be more injurious. We believe it appropriate for the court to consider the fact any physical injury resulted from the discipline along with the psychological effects of the discipline on the child, and the circumstances surrounding the "discipline," including whether the parent was calmly attempting to discipline the child or whether the parent was lashing out in anger. We are unable to accept West's argument she merely administered or threatened reasonable corporal punishment. We believe, as did the trial court, West's conduct exceeded the bounds of reasonableness.

The trial court did not err in finding F.W.'s environment to be injurious to her welfare as the result of this conduct.

The order of the circuit court of Champaign County is affirmed.

Affirmed.

COOK and GREEN, JJ., concur.