THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAN ANTHONY RANCE, Defendant-Appellant.

First District (5th Division)   No. 78-212

Opinion filed February 2, 1979.

Julius Lucius Echeles and John Lanahan, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of theft and conspiracy. (Ill. Rev. Stat. 1975, ch. 38, pars. 16—1 and 8—2(a).) The trial court vacated the conspiracy conviction but sentenced defendant to four years' probation for theft, the first year to be served in periodic imprisonment. On appeal, defendant contends that the alleged corporate existence of the theft victim was not proven, that the trial court erroneously denied his motion to vacate the jury's verdict, and that he was not proven guilty of theft beyond a reasonable doubt.

The following pertinent evidence was adduced at trial.

*Alan James Anderson*

He works for CNA Insurance, and from mid-1973 to the end of 1975 was manager of the general group claims department. Claims processing by that department would begin when an insured sent in a claim and supporting documentation. Either the name on the claim or its number would be checked to determine that the claimant was a member of an insured group. The claim and a relevant claim file were then given to the appropriate claim adjuster, who would determine the amount, if any, of payable benefits, would complete a form authorizing such payments, and would give this form to a typist who would prepare a draft for the indicated amount. The draft would then go to a draft signer who would verify it for correctness and, if correct, authorize it by signature. The draft would then consist of the original and four carbon copies. The original and the last copy would be sent to the payee. The third copy is mailed to the payee's employer. The second copy would become part of the claim file, and the first copy, which was blue, would be for data processing. From mid-1973 to mid-1974, the group claims draft typists were Andrea Austin, Karen Kasmark and Angelique Woods. The draft signer was Joyce Mitchell. Defendant Dan Anthony Rance was one of the department's claim adjusters, and had access to all claim files in the storage area.

On cross-examination he acknowledged that there were 13 or 14 claim adjusters, that draft typists were not assigned to any particular adjuster, and that all of the department's employees had access to the claim file room.

*Oliver T. Pearson*

He works for CNA Insurance and in August of 1974 was the supervisor of the lost draft control department. Drafts were paid by a process involving a daily acceptance of drafts from the Harris Trust Bank. CNA checked the drafts, and authorized payment on those which have the correct draft signer's signature and endorsement. CNA authorizes Harris Trust to pay drafts which are found to be in order and returns unaccepted drafts to the bank.

*Joyce Mitchell*

She works for CNA Insurance Company and in December of 1973 was the draft signer in general group claims. She knew defendant Dan Anthony Rance to be one of group claims' adjusters, and Angelique Woods to be a draft typist. She corroborated Alan Anderson's account of how drafts were prepared and how many copies were kept. The blue processing copy would go to her desk. Blank draft forms were kept in an unlocked cabinet which all draft typists had access to. Her standard procedure is to count the number of blue copies on her desk every night before she leaves work, and to recount them the following morning. On the evening of June 10, 1974, she had 181 blue copies on her desk, while on the following morning, June 11, she had 186 blue copies. She checked through the copies and found the five extra ones. Those five all lacked the insured's address, were typed in a type face bigger than the one normally used and bore the name "Joyce Mitchell" in a signature which was not her handwriting. She had not authorized anyone to sign her signature. She gave these five copies to Ann Evans, her supervisor. She identified an additional 36 documents as CNA drafts that bore the signature "Joyce Mitchell." That signature was not her own, and she did not authorize anyone else to sign her name for her.

On· cross-examination she admitted that she knew Dan Anthony Rance was an ordained minister and that she used to see him in church every Sunday. She acknowledged that she never saw Rance with any of the documents she testified to, and that she never saw him sign her name.

*Frank D. Arion*

In 1974 he was an internal auditor for CNA Insurance. On June 11, 1974, he was instructed to check whether any fraudulent drafts had been issued out of the group claims department. He subsequently talked to Joyce Mitchell and was shown the five blue copies of drafts which she testified to. He checked and could not find any files for those five claims,

and he stopped payment on them. He inspected the file of drafts that had already been paid. In the file for Janitor's Local No. 1 he found 20 paid drafts which had been issued from April through June 1974. He checked and found that Janitor's Local No. 1's insurance policy had been cancelled as of February 1, 1974. He could not find any claim forms, doctor bills or other documentation of claims for those 20 drafts. From June 11, 1974, until sometime in August, he found a total of 36 drafts for which he could not find claim files documentation.

On cross-examination he explained that because Janitor's Local No. 1's policy was cancelled on February 1, 1974, CNA would continue to pay claims that occurred before that date, even if they arrived late, but would not pay any claims that occurred afterward.

All parties stipulated that if the payees named on the CNA drafts previously referred to were called, they would testify that they never received any part of the proceeds paid under said drafts, that they never submitted claims for the amounts indicated thereon, and that the signatures endorsed on the backs of those drafts are not theirs, and were placed thereon by someone without lawful authority to do so.

*Angelique Renee Woods*

She currently is a member of the United States Army and is stationed in Germany. In December of 1973 she worked as a typist in the group claims department of "C & A Insurance Company." Her work consisted mostly of typing draft forms, approximately 30 to 40 a day, each of which consisted of an original and four copies. She typed on the draft certain information regarding the payee which she got from a claim file that a claim adjuster would bring to her. Blank drafts were kept on the table in front of each typist. She knew Joyce Mitchell, who would look drafts over, check them, and then sign them. She also knew defendant Dan Anthony Rance, who worked near her in the group claims department.

One morning in the middle of December, 1973, Rance asked her to do him a favor and type up some drafts, and give them to him instead of to Joyce. He told her she would get money for doing it. Subsequently, one morning in the middle of January, Rance brought about five claim files to her desk. He wanted her to type up drafts based on the information in those files. She did this and took the drafts to Rance's desk, stating that there were corrections to be made on them. Rance telephoned her one evening and asked her how much she wanted for typing up the drafts. She said that she wanted $175 for each draft over $1000. They agreed on that amount and that she would be paid as soon as the money came in. She met Rance after work sometime in mid-January in the lobby of the CNA building, and he gave her an envelope containing $75 to $100 in cash. At the end of January or beginning of February she typed up about five more drafts from files Rance brought her. At the end of February she

called him and asked when she was going to be paid. He said he would pay her when it came in. He also told her that the blue copies had to go "into the system" and that she would have to insert them into Joyce's pile. At the end of February or beginning of March, Rance brought her five to seven more files for which she again prepared drafts. At this time she began to place the blue copies on Joyce Mitchell's desk. She did this one morning at approximately 7 a.m. by getting the blue copies, which Rance kept in a magazine in the bottom drawer on the right hand side of his desk, and placing them with Joyce Mitchell's other copies. In the middle of March Rance brought her another five to eight claim files. She typed drafts for these and, early in the morning a day or two later, placed the blue copies on Joyce Mitchell's desk. She estimated that from January through March of 1974 she typed between 25 and 30 drafts in the names she described, and placed blue copies for "about all of them" on Joyce Mitchell's desk. At the end of March she talked to defendant on the phone. She asked him about being paid, and he told her she would be paid "as soon as the runner came through." He also told her that he didn't want her to type any more drafts for him, and asked her to get him some blank draft forms. She later gave him between 10 and 15 blank draft forms. Between January and the end of March, 1974, she received money from Rance no more than four times, and received a total of $1,000. She identified 25 drafts which she typed for Rance as described, and which she recognized by the typeface which was from her typewriter. The drafts were not in the same condition as they were when she gave them to Rance, since each draft contained Joyce Mitchell's signature on the front, and a signature and bank stamp on the back. She identified 11 more drafts as ones she did not type because they were prepared in June, while she stopped typing for Rance at the end of March, and because the typeface on them was larger than the one on her typewriter. She received blue copies from Rance after March 1974 and placed them on Joyce Mitchell's desk.

On cross-examination she admitted that Assistant State's Attorney Edward Berman told her that if she would come forward willingly, they would not prosecute. She acknowledged that the State's Attorney's Office paid her fare to come from Atlanta to Chicago and testify, and was paying for her room rent and meals. She acknowledged that she typed drafts only under the Janitor's Local No. 1 policy, and said that a draft from another policy was typed on her typewriter, but was not typed by her. She estimated that for drafts under $1,000 Rance was to pay her $25 or $50. She admitted that she testified before a grand jury on March 11, 1976, and stated then that she was to be paid $125 to $250 for each draft depending on the draft's amount. She acknowledged that as of March 1974 Rance owed her several thousand dollars, which he did not pay her.

She conceded that in a statement made July 29, 1974, she characterized Rance's debt to her as "over four hundred dollars." She stated that Rance paid her on four occasions although she then conceded that in her statement of July 29, 1974, she said that he paid her "about eight times." She admitted that she never saw any of the drafts she typed in Rance's hands. She acknowledged that she was to be paid some extra unagreed upon amount for inserting the blue copies on Joyce Mitchell's desk, but she never received that amount. She stated that Rance never paid her at her house, but then conceded that on October 15, 1974, she told an investigator from the Illinois Bureau of Investigation that he paid her once at her house.

It was stipulated that if Fern Henderson of the Tri-State Bank and James Digby of the Guaranty Bank and Trust Company were called they would testify that a number of the CNA drafts previously testified to were deposited into bank accounts under the names of LeRoy Palmer and Charles E. McDonald.

*For the Defense*

*Charles E. McDonald*

He never saw Rance before these court proceedings began.

*Frank Glover, Azelle Carter, Jr. and Butler R. Stapleton*

They have all known Dan Anthony Rance for a number of years and know his reputation in the community for truth, honesty, veracity and integrity to be excellent. Carter testified during the incident in question, he worked for CNA Association, which is a parent company of CNA Insurance Company.

*Defendant Dan Anthony Rance on his own behalf*

In mid-1973 he was employed as a claim adjustor trainee in the group claims department of CNA Insurance Company. While working there he knew Angelique Woods and Joyce Mitchell. He never worked on the Janitor's Union account and he never asked Angelique Woods to prepare any claim drafts for the Janitor's Union files. He examined the 36 CNA drafts previously testified to, and stated that he had never seen them before they were shown to him either at CNA in June 1974 or at trial, and that he never received any proceeds from them. He never signed the name "Joyce Mitchell" to any of those drafts. He never asked Angelique Woods to type some claim drafts for him and return them to him instead of to Joyce Mitchell. He never gave Woods any money or visited her apartment. He did not know about blue slips of drafts because it wasn't in his department. He never left any of the blue slips in his drawer for Woods to pick up, and he never asked her to insert some blue slips into the stack on Joyce Mitchell's desk. He never asked Woods to give him

some blank claim drafts and he never received any from her. He did not commit theft or conspire to commit theft against CNA Insurance Company from December 1973 to July 1974.

On cross-examination he stated that he is an ordained minister in the Baptist, Spiritualist and Science of Mind Metaphysic denominations. He admitted that during his work at CNA he had seen completed drafts intact with their copies, and that he regularly assisted typists in completing correct drafts.

OPINION

■■ Defendant first contends that the State failed to prove the existence of the victim named in the indictment, which charged him with the theft of property "of CNA Insurance, a corporation." He first points out that where the owner of stolen property is a corporation, the legal existence of the corporation is a material fact which must be proven. (*People v. Geraci* (1974), 25 Ill. App. 3d 191, 323 N.E.2d 48.) He argues that this requirement was not met, because no oral testimony was presented to prove CNA Insurance's corporate status. We note that although direct evidence as to CNA Insurance's corporate status was not adduced, Joyce Mitchell, whose name was forged on the stolen drafts, testified at trial that she worked for "CNA Insurance Company." Angelique Woods testified that she typed many of the improper drafts, and also testified that she worked for "C & A [*sic*] Insurance Company." Defendant himself, testifying on his own behalf, stated that he worked with Mitchell and Woods at "CNA Insurance Company" and acknowledged familiarity with CNA insurance drafts. Although he specifically denied committing the crime charged, defendant's own testimony clearly tended to establish that the State had met its burden of informing defendant of the charge against him and establishing that CNA Insurance Company was the owner of the drafts in question. (See *People v. Jones* (1972), 7 Ill. App. 3d 183, 287 N.E.2d 206.) Moreover, we have previously noted that under section 9 of the Business Corporation Act (Ill. Rev. Stat. 1975, ch. 32, par. 157.9(a)), the word "company" connotes an incorporated entity. (*People v. Voleta* (1965), 57 Ill. App. 2d 279, 206 N.E.2d 737.) "A trier of fact may use common sense and general knowledge in considering evidence and drawing the proper inference from it." (*People v. Toliver* (1978), 60 Ill. App. 3d 650, 652, 377 N.E.2d 207, 209.) This rule and the testimony referred to above support the conclusion that there was sufficient proof that CNA Insurance was a corporation as the indictment alleged.

■ Defendant further argues that in spite of the proof discussed above, the identity of the actual victim of the theft referred to was not sufficiently proven. He argues that although the victim was generally

referred to throughout the trial as "CNA Insurance" or "CNA Insurance Company," the real victim may well have been an entity entitled "Continental Casualty Company." In supporting this argument, defendant cites the following exchange totally outside the presence of the jury, between the trial court and the Assistant State's Attorney:

"THE COURT: What you are saying is that there is no such thing as CNA Insurance, a corporation.

ASSISTANT STATE'S ATTORNEY: This is correct. I have to say that that is what I was informed of last night. We clearly have a victim here, and the victim has been identified in the State's proof.

THE COURT: You say the victim is what, Continental Casualty?

ASSISTANT STATE'S ATTORNEY: Right, your Honor."

"Continental Casualty" was referred to as the "victim" in the above exchange based on the Assistant State's Attorney's statement that said entity was the actual holder of the funds drawn under the CNA Insurance drafts referred to in this case. In the entire discussion excerpted above, the Assistant State's Attorney further indicated that CNA Insurance and Continental Casualty Company are not independent corporations, but are interrelated corporate subdivisions of a parent corporation referred to as CNA Finance Association. We note that none of these statements was ever established at trial, and that the jury only heard the owner of the stolen funds referred to by the State and defense witnesses, as "CNA Insurance" or "CNA Insurance Company." Defendant nevertheless argues that accepting the remarks of the Assistant State's Attorney as established facts, he is not protected from the problem of double jeopardy. Under his argument, that problem would arise when a suit for the same theft is brought naming "Continental Casualty" or some other entity as the real victim of the same theft that was here at issue.

We reject this argument. In *People v. Kaprelian* (1972), 6 Ill. App. 3d 1066, 286 N.E.2d 613, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2730, we rejected a similar argument concerning double jeopardy. We noted that defendants had recourse to the record and the testimony contained therein to establish a defense of prior jeopardy in any subsequent prosecution for the same offense. (6 Ill. App. 3d 1066, 1071, 286 N.E.2d 613, 617.) Similarly in *People v. Sims* (1975), 29 Ill. App. 3d 815, 331 N.E.2d 178, we stated that defendant:

"[H]as the complaint, the transcript of the trial and the opinion of this court to shield him from a second prosecution for the same offense * * * to reverse his conviction for an unprejudicial failure of proof would be elevating form over substance and would be promoting a minor irregularity into a major defect affecting a

substantial right." (29 Ill. App. 3d 815, 818, 331 N.E.2d 178, 180; see also *People v. McAllister* (1975), 31 Ill. App. 3d 825, 334 N.E.2d 885.)

Defendant does not and cannot contest the established fact that the stolen and forged drafts which were referred to at trial and which formed the basis of the charges against him were the property of CNA Insurance Company. We cannot agree that a serious danger of double jeopardy is raised by defendant's emphasis on the unproven possibility that the funds drawn by those CNA drafts were actually owned or held by some other inter-related corporate entity. We conclude that the trial testimony and this opinion adequately protect defendant from any further attempted prosecution concerning the same insurance drafts and arising out of the same operative facts.

Related to the above argument is defendant's contention that the trial court erroneously denied his motion to vacate the jury verdict. Defendant points out that a co-defendant, Charles E. McDonald, was tried by bench trial simultaneous with his jury trial. McDonald was acquitted by the trial court because it found that CNA Insurance's corporate status was not proven beyond a reasonable doubt. Defendant reasons that such a finding should have been made by the jury in his case, and that because they failed to make such a finding, their verdict should have been vacated. We disagree. The general rule in Illinois is that the failure to convict one co-defendant does not raise a reasonable doubt as to the guilt of the other co-defendant. (See *People v. Rogers* (1959), 16 Ill. 2d 175, 157 N.E.2d 28.) "For a reasonable doubt to be raised in such cases, it must be shown that the evidence given against all of the defendants is identical in all respects." (*People v. Stock* (1974), 56 Ill. 2d 461, 465, 309 N.E.2d 19, 21.) The record shows that the evidence heard in this case against defendant and co-defendant McDonald was not "identical in all respects." As we previously noted, defendant testified on his own behalf that he worked for "CNA Insurance Company." Azelle Carter, Jr., one of the character witnesses called by defendant on his behalf, also referred to "CNA Insurance Company." This testimony was heard only in connection with defendant's trial and, as we indicated above, was sufficient to support the jury's conclusion that CNA Insurance Company was a corporation. This conclusion was also supported by other evidence adduced at trial, including the drafts themselves which have the title "CNA Insurance Company." The jury and the trial court operated as separate triers of fact and heard different evidence as to the two defendants. Different verdicts could properly be reached, and the jury's verdict should not have been and will not be disturbed.

■ Defendant next contends that he was not proven guilty beyond a

reasonable doubt. He first points out that under section 16—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 16—1), the gravaman of the offense of theft is the obtaining or exerting of unauthorized control over the property of another with the intent to permanently deprive him of the benefit thereof. (*People v. Shoemaker* (1975), 31 Ill. App. 3d 724, 334 N.E.2d 347.) Defendant argues that no evidence was presented at trial which proved that he controlled any of the funds which were paid under the stolen drafts and that his conviction for theft therefore cannot stand. We disagree. The testimony of Angelique Woods clearly established that defendant exerted unauthorized control over the stolen and forged CNA Insurance drafts. The State concedes that the funds drawn under those same drafts "were deposited in and credited to the bank accounts of other individuals." However, as the State correctly points out, a conviction may be sustained on circumstantial as well as direct evidence, and the inferences which it is the jury's province to draw from the evidence. (See *People v. Toolate* (1976), 45 Ill. App. 3d 567, 359 N.E.2d 1062; *People v. Wilkins* (1976), 36 Ill. App. 3d 761, 344 N.E.2d 724.) On this basis, in light of all the evidence, we conclude that the State sufficiently established the required element of defendant's control over the stolen property.

■ Defendant further argues, however, that because the jury's verdict was based upon the testimony of Angelique Woods he was not proven guilty beyond a reasonable doubt. He points out that by her own admission, Woods was promised by the State's Attorney's Office that in return for her testimony, she would not be prosecuted. He argues that this fact and various inconsistencies which he alleges to exist in her testimony lead to the conclusion that it was not sufficiently credible to support his conviction beyond a reasonable doubt. We first note that, contrary to defendant's claim, our review reveals that any inconsistencies in Woods' testimony were minor. Further, our supreme court has "repeatedly held that a conviction can be sustained by the uncorroborated testimony of an accomplice if the trier of fact is convinced of guilt beyond a reasonable doubt." (*People v. Palmer* (1962), 26 Ill. 2d 464, 469, 187 N.E.2d 236, 239 *cert. denied* (1963), 373 U.S. 951, 10 L. Ed. 2d 706, 83 S. Ct. 1681.) Although such testimony is fraught with such weaknesses as the promise of immunity or the accomplice's malice toward the accused, the question of whether it is a satisfactory basis for conviction is nevertheless one which goes to the weight of the evidence and is therefore within the province of the jury to decide. (*People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291.) We will not reweigh or set aside the jury's determination of guilt unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to cause a reasonable doubt as to guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435

U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) We conclude that the jury's determination of guilt was adequately supported in this case and should not now be set aside.

Based on the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.