THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHEVALL WILSON, Defendant-Appellant.

First District (2nd Division)  No. 1—92—0467

Opinion filed March 22, 1994.

Michael J. Pelletier and Linda Eigner, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica Calderon, and Diane Meyer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

At about 11:30 p.m. on November 29, 1990, Joseph Dukes was robbed at gunpoint by several young men outside the French Quarters, a tavern at 3743 West Chicago Avenue in the City of Chicago. He was returning from a nearby restaurant where he had bought food for his wife, Dorothy Dukes, who owned the tavern. One of the young men hit Dukes with a pistol while the three others took two rings from him and rummaged through his pockets, removing approximately $25. Dorothy Dukes and the Dukes' friend, Reginald Mack, witnessed the robbery from inside the tavern. The bartender, apparently aware of the robbery, shook the burglar gates at the tavern's front window, and the young men then fled.

Immediately after the assault, Joseph Dukes flagged down a police car and told the officers that he had been robbed and that he would be able to recognize his assailants if he saw them again, although he did not provide them with a description of the robbers.

The officers drove Dukes around the neighborhood for about 20 minutes searching for the robbers, but without success.

About four days after the robbery, Joseph Dukes' 25-year-old daughter, Karen, provided him with the first names and addresses of three of the robbers, including defendant's, and a general description of the fourth. Dukes phoned the police with the information, but they did not respond to his call. However, on December 9, 1990, Officers Roy Isakson and Judith Carr met with Dukes regarding an unrelated theft, and at that time, he gave them the information he had received from Karen. Without contacting Karen or inquiring how she came upon this information, Carr and Isakson returned to the police station and consulted the robbery case report, which stated that the robbers were four black males between 16 and 21 years old. Isakson testified that they did not obtain arrest warrants because of the late hour.

Between 3 and 4 a.m., the officers went to the addresses supplied by Dukes to arrest the individuals named by his daughter. They arrested Christopher Holmes and Marcus Terry and then proceeded to defendant's home. There his father told the officers that defendant was "spending the night at James' house." One of the men in the car directed the officers to "James' " house, where they arrested defendant and James Burley, who matched the description of the fourth person that Karen had given her father. Defendant was 15 years old at the time of his arrest.

At about 8 a.m., Joseph and Dorothy Dukes and Reginald Mack viewed a showup of the four suspects, but, according to their testimony, none of them identified defendant. However, the arrest report on defendant and his pretrial motion indicate that defendant was "identified in a lineup."

Assistant State's Attorney Lauren Freeman testified that at about 2:30 p.m., she met with defendant and identified herself as an attorney working with the police, advised him of his *Miranda* rights, and told him that he could be charged as an adult in this case. A juvenile officer was present with Freeman when defendant gave a statement relating that he was walking with two girls when he saw his codefendants near the French Quarters. They told him to watch for the police. Defendant "had a hunch" that they planned to rob Joseph Dukes, who was walking across the street, and he watched for the police, as directed. Defendant saw the robbery, and afterwards, he and his three codefendants ran away.

Defendant and his codefendants were charged by indictment with armed robbery and aggravated battery. (Ill. Rev. Stat. 1989, ch. 38, pars. 18—2(a), 12—4(b)(8).) After the trial court simultaneously heard Terry's, Burley's, and defendant's pretrial motions to quash arrest

and to suppress evidence, the judge found that the officers had acted in good faith in making the arrests, although they had only "thin evidence of probable cause" when they arrested defendant and Terry. The judge added that "[t]here wasn't a tremendous amount of information linking the two to the crime, but there was sufficient probable cause for the officers to act." He nonetheless found that when the officers arrested Terry and defendant at private dwellings, they violated *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (holding that police may not make a warrantless arrest at a suspect's residence absent consent or exigent circumstances). The judge granted Terry's and defendant's motions to quash arrest, but refused to suppress evidence, finding that pursuant to *New York v. Harris* (1990), 495 U.S. 14, 109 L. Ed. 2d 13, 110 S. Ct. 1640, evidence obtained apart from an illegal arrest under *Payton* is admissible. The judge also found that the officers had no probable cause to arrest Burley and granted his motion to quash arrest and to suppress evidence.

The cases were severed for trial, but the four defendants were tried in the same proceedings—a jury trial for defendant and simultaneous bench trials for his codefendants. The judge excused the jury when witnesses were cross-examined by defendant's codefendants' counsel.

At trial, Joseph Dukes identified defendant as one of the robbers, although he could not recall where defendant was standing during the robbery because, at that time, he was focusing on the gun. He stated that as the robbers fled, he saw defendant from about 75 feet away turn around to pick up his cap, and that he recognized defendant from seeing him 10 or 12 times in the neighborhood. He also identified Holmes, stating that he often visited his grandmother in the tavern. Dukes recalled that his daughter got the information regarding the robbery from defendant's uncle.

Mack testified that he was looking out the tavern window when he saw the robbers surround Joseph Dukes; he then went to the back of the tavern and told Dorothy Dukes that her husband was being robbed. When he returned to the window, the bartender was shaking the burglary bars and the robbers ran away. He stated that defendant stood at Dukes' right side during the robbery. Mack got a second look at the robbers as they doubled back and ran down the street. Mack identified each defendant in court, although at the showup, he identified only Terry and Burley; at trial, he claimed that defendant was not in the showup.

Dorothy Dukes testified, identifying defendant, Holmes and Burley. She stated that she saw defendant going through her husband's

pockets during the robbery. She recognized the defendants because they lived in the neighborhood and she had seen them "all the time." She testified that she saw defendant at the police station, but later admitted that she found it difficult to tell defendant and Burley apart. On cross-examination, she said that she did not remember whether defendant was in the showup. She recalled that her stepdaughter got the names of the robbers when "she was there when they was [sic] talking about it because she seen [sic] her father's ring."

Detective Robert Meyer testified that the defendant was in the showup, but that Joseph Dukes failed to identify him. Meyer also testified that his report on the showup contained no information regarding Joseph Dukes' observation of the showup or his inability to identify defendant.

At the close of the State's case, defendant moved for a "directed finding," but the trial judge denied the motion. He granted Burley's motion for a directed verdict (whatever that means in a bench trial), found Terry not guilty of both charges and found Holmes guilty only of armed robbery. The jury found defendant not guilty of aggravated battery and guilty of armed robbery. The trial judge sentenced him to six years in the custody of the Illinois Department of Corrections. This appeal followed.

Defendant first argues that his warrantless arrest was made without probable cause, violating both the Federal and Illinois Constitutions (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6), and that his subsequent confession was the fruit of the illegal arrest. He argues that the tip from the victim's daughter was "purely conclusory" and provided the police with no details susceptible of corroboration. According to defendant, the police made the arrest knowing nothing of the source of the information or Dukes' daughter's veracity and reliability.

It is axiomatic that a warrantless arrest must be based upon probable cause. (See *Dunaway v. New York* (1979), 442 U.S. 200, 208-09, 60 L. Ed. 2d 824, 833, 99 S. Ct. 2248, 2254.) Probable cause to arrest exists when a reasonable and prudent person " 'having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense.' " (*People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147, 153, quoting *People v. Wright* (1968), 41 Ill. 2d 170, 174, 242 N.E.2d 180, 183.) Mere suspicion is inadequate to establish probable cause, but the evidence relied upon by the arresting officer need not be sufficient to prove guilt beyond a reasonable doubt or even be admissible at trial. Technical rules do not govern the assessment of whether probable cause existed; rather, practical, commonsense considerations guide that determina-

tion. (*People v. Jones* (1990), 196 Ill. App. 3d 937, 954, 554 N.E.2d 516, 526, *appeal denied* (1990), 133 Ill. 2d 565, 561 N.E.2d 700; see also *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (adopting a "totality of the circumstances" test for determining probable cause which includes, but is not limited to, an examination of the informant's veracity and her basis of knowledge).) As the Supreme Court has stated, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 76 L. Ed. 2d at 544, 103 S. Ct. at 2329.

A trial judge's determination of probable cause must be based upon standards at least as stringent as those applied by a magistrate when deciding whether to issue a warrant. (*Tisler*, 103 Ill. 2d at 236, 469 N.E.2d at 153.) A ruling on a motion to quash arrest and suppress evidence will not be disturbed by a reviewing court unless it lacks a substantial basis and is manifestly erroneous. *People v. Villarreal* (1992), 152 Ill. 2d 368, 373, 604 N.E.2d 923, 925.

Although probable cause may be established with less than proof beyond a reasonable doubt, the evidence must be supported by some indicia of reliability (*Jones*, 196 Ill. App. 3d at 954, 554 N.E.2d at 526), and uncorroborated tips from unknown informants do not constitute probable cause. (*People v. Ramos* (1969), 112 Ill. App. 2d 330, 335, 250 N.E.2d 822, 824.) Historically, citizen informants have been deemed credible and reliable, because they are usually victims or eyewitnesses acting to aid in criminal investigations, in contrast to paid informants who assist the police in the hope of pecuniary gain. (See *People v. Adams* (1989), 131 Ill. 2d 387, 397-98, 546 N.E.2d 561, 565-66; see also 1 W. LaFave, Search & Seizure §§ 3.4(a) through (c), at 713-49 (2d ed. 1987).) Because of their different incentives, a paid informant's credibility and reliability traditionally have been subject to closer scrutiny than a citizen informant's in probable cause determinations. (See *Adams*, 131 Ill. 2d at 397, 546 N.E.2d at 566.) However, our supreme court has instructed that classifications of citizen informants and paid informants are actually " 'terms of art that represent opposing ends on a continuum of reliability,' " and thus exemplify a "shortcut" to determinations of credibility and reliability. (*Adams*, 131 Ill. 2d at 397-98, 546 N.E.2d at 566, quoting *People v. Townsend* (1980), 90 Ill. App. 3d 1089, 1095, 414 N.E.2d 483, 488.) Therefore, whether police act on a tip from a citizen or a paid informant, a probable cause determination must be grounded in an examination of all the information available to police, including its source, in light of the essential inquiry, *i.e.*, whether, at the time of the arrest, the police were justified in believing that the suspect in

question was involved in criminality. See *Adams*, 131 Ill. 2d at 398, 546 N.E.2d at 566.

■ Viewing the totality of the circumstances in the case at bar, when the police arrested defendant, they knew only that an armed robbery had been committed by four black males between the ages of 16 and 21 and that the victim's daughter had supplied him with the first names and addresses of three young men and a description of a fourth. We hold that this is insufficient to support a finding of probable cause. Compare *People v. Hollins* (1988), 169 Ill. App. 3d 304, 308, 523 N.E.2d 1309, 1311 (unsubstantiated tips from unknown individuals did not constitute probable cause), with *People v. Ramey* (1992), 240 Ill. App. 3d 456, 460-61, 608 N.E.2d 512, 515, *appeal denied* (1993), 152 Ill. 2d 574, 622 N.E.2d 1222 (probable cause existed to arrest the defendant when police relied on hearsay information from a citizen informant which was corroborated by a codefendant's statement).

The State argues that the providers of the information were the victim and his wife, an eyewitness, and that, therefore, it was "properly presumed reliable by the arresting officers." We find that the State's analysis fails to recognize what is required to establish probable cause and disregards the rationale for the distinction between citizen and paid informants, that is, "to assure that individuals [are] protected from unreasonable searches and seizures by demanding that reliable information be provided before a person is stopped or searched." (*Adams*, 131 Ill. 2d at 397-98, 546 N.E.2d at 566.) Here, the police did not have information directly from the victim or an eyewitness; rather, the victim was merely a conduit for a tip from his daughter, and the officers made no effort to evaluate her veracity or to discover the basis of her knowledge. We find unpersuasive the State's argument that by examining the arrest report and finding codefendants at their homes before arresting defendant, the police corroborated the tip from the victim's daughter. In fact, none of this information connected defendant to the armed robbery.

In our view, the present case closely parallels *People v. Hollins* (1988), 169 Ill. App. 3d 304, 523 N.E.2d 1309. In *Hollins*, the only information linking the defendant to a grocery store burglary was a statement by an unknown person to a police officer that the defendant and his brother were involved in the burglary. The arresting officer also knew that an unidentified person claimed that a car normally parked at the defendant's residence was at the store on the night of the burglary, and that the store owner had heard that members of the defendant's family had tried to sell processed meats carried by the store and that the defendant's family "w[as] living

great and had a lot of good stuff cooking." (*Hollins*, 169 Ill. App. 3d at 306-08, 523 N.E.2d at 1310-11.) We held that the totality of the facts and circumstances known to the police at the time of the defendant's arrest "was hardly information that would lead a reasonable person to conclude that the defendant had committed the offense in question." *Hollins*, 169 Ill. App. 3d at 308, 523 N.E.2d at 1311.

Likewise, in *People v. Haymer* (1987), 154 Ill. App. 3d 760, 506 N.E.2d 1378, we affirmed the trial judge's determination that the defendant had been arrested without probable cause. In that case, the police knew that the defendant's car had been observed at the scene of the shooting, that the defendant and one of his codefendants admitted being at the scene but claimed that they were uninvolved in the shooting, and that the defendant failed a lie detector test. We acknowledged that these facts gave rise to a suspicion that the defendant was involved in the crime and the police had reason to question him. We held, however, that they were insufficient to support a finding of probable cause to arrest because there was no evidence beyond mere suspicion or rumor that the defendant participated in the crime. We further noted that despite the Supreme Court's disapproval of investigatory arrests, the police officers' apparent purpose in arresting the defendant was to seek evidence that would establish probable cause and justify the arrest. *Haymer*, 154 Ill. App. 3d at 768, 506 N.E.2d at 1383-84; see also *People v. Almodovar* (1992), 235 Ill. App. 3d 144, 601 N.E.2d 853 (remanding for an evidentiary hearing after finding that the police may have arrested the defendant without probable cause when the record revealed that the only information linking him to the crime was from an anonymous tipster relating the "word on the street").

Similarly, in the present case, the police had no basis for arresting defendant beyond mere rumor or suspicion, sufficient bases for questioning him but not for arresting him. Here, the State having conceded at oral argument that the police were conducting an investigation when they made the arrests, we reiterate the admonition in *Haymer* cautioning against investigatory arrests made in the hope that some evidence will be discovered upon which to bootstrap probable cause. Moreover, the State does not argue that exigent circumstances justified an immediate arrest and no such circumstances appear on the record. (See *People v. Foskey* (1990), 136 Ill. 2d 66, 74-76, 554 N.E.2d 192, 196-97 (discussing the exigent circumstances exception to the warrant requirement).) In fact, the officers' only excuse for not obtaining an arrest warrant was the lateness of the hour.

The State asserts that the source of the information justifying

the arrest was revealed through testimony adduced at trial indicating that the victim's daughter saw proceeds from the robbery, that she heard the robbers discussing the crime, and that her sister was the mother of defendant's uncle's child. However, these facts were not within the officers' knowledge at the time of the arrest. As our supreme court has cautioned, a probable cause determination cannot be predicated upon "hindsight which may luckily seem to be supported by the fruit of some criminality; rather, the review must center on the information available to the officers preceding the search or arrest." (*Adams*, 131 Ill. 2d at 398, 546 N.E.2d at 566.) Thus, we will not consider facts which emerged only at trial; as a consequence, we find no substantial basis for the trial court's determination that probable cause existed for defendant's arrest.

■ We further hold that defendant's inculpatory statement should have been suppressed because it was a direct result of his illegal arrest. We have stated that in order for evidence obtained after an illegal arrest to be admissible, intervening circumstances must provide "a cause so unrelated to the initial illegality that the acquired evidence may not reasonably be said to have been directly derived from that illegal arrest." (*People v. Faulisi* (1977), 51 Ill. App. 3d 529, 534, 366 N.E.2d 1072, 1076.) The Supreme Court has articulated several relevant factors in determining whether evidence is sufficiently attenuated from an illegal arrest, including: (1) a threshold determination that the statement was voluntary; (2) the temporal nearness of the arrest and confession; (3) the presence of intervening circumstances; and (4) the "purpose and flagrancy of the official misconduct." (*Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.) The burden of showing attenuation is on the State. (*Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262.) In applying the *Brown* factors, the time lapse between the illegal arrest and the defendant's statement has been aptly described as an ambiguous factor, since while intervening circumstances are less likely to exist if a defendant confesses shortly after his arrest, an extended illegal detention may be more oppressive and more likely to coerce a suspect into confessing. See *People v. White* (1987), 117 Ill. 2d 194, 223-24, 512 N.E.2d 677, 688, *cert. denied* (1988), 485 U.S. 1006, 99 L. Ed. 2d 698, 108 S. Ct. 1469; see also 4 W. LaFave, Search & Seizure § 11.4(b), at 402-03 (2d ed. 1987).

In the present case, an analysis of the *Brown* factors weighs in favor of defendant's argument that his confession should have been suppressed by the trial court. Defendant concedes that his statement was voluntary. The approximately 11 hours between defendant's illegal arrest and his confession in our view do not dissipate the taint of

the illegal arrest, especially in view of defendant's youth. (See *White*, 117 Ill. 2d at 223-24, 512 N.E.2d at 688 ("where no intervening circumstances are present, a long and illegal detention may in itself impel the defendant to confess").) The State points out that his codefendants implicated defendant in the armed robbery, but nothing in the record indicates that he was aware of their statements; thus, they cannot be viewed as intervening circumstances and no other such circumstances are evident from the record. The only *Brown* factor weighing in the State's favor is the fact that the trial court found that the police acted in good faith when they arrested defendant. Consequently, we agree with defendant that his statement was a direct result of his illegal arrest and that it should have been suppressed. See *People v. Garcia* (1981), 94 Ill. App. 3d 940, 419 N.E.2d 542 (holding that evidence obtained as a result of the defendant's illegal arrest should have been suppressed, notwithstanding the police officers' good faith, when the evidence was uncovered over an uninterrupted nine hours of questioning by police); see also *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.

Our holding reversing the trial court's ruling on defendant's motion to quash arrest and to suppress evidence requires that we remand this case for a new trial; but because the issue may arise at defendant's retrial, we address his contention that his conviction should be vacated or, in the alternative, reduced to robbery because codefendant Terry was acquitted and codefendant Holmes was convicted of only robbery. Defendant argues that the inconsistent verdicts raise a reasonable doubt as to his guilt. We disagree.

■ Under Illinois law, the failure to convict one codefendant does not necessarily raise a reasonable doubt as to the guilt of the other defendant. (See *People v. Rance* (1979), 68 Ill. App. 3d 639, 647, 386 N.E.2d 566, 572.) Unless the evidence against all codefendants is identical in every respect, differing verdicts for codefendants do not warrant reversal of one defendant's conviction. (*People v. Cartalino* (1982), 111 Ill. App. 3d 578, 584, 444 N.E.2d 662, 669.) Moreover, although there is some authority to the contrary (see *People v. Beasley* (1976), 41 Ill. App. 3d 550, 353 N.E.2d 699; *People v. Carter* (1974), 19 Ill. App. 3d 21, 311 N.E.2d 213), we believe that the better view is that when codefendants are jointly tried before a judge and jury on the same facts, and the verdict of each is reasonable and supported by the evidence, uniformity of verdicts is not required. Each trier of fact weighs the evidence, assesses the credibility of witnesses and applies the law "on the basis of its preconceived attitudes and experiences." (*People v. Wehmeyer* (1987), 155 Ill. App. 3d 931, 944, 509

N.E.2d 605, 613.) A reviewing court is not bound to reverse conflicting verdicts simply because one trier of fact is more lenient than another or finds witnesses more credible. *Wehmeyer*, 155 Ill. App. 3d at 944, 509 N.E.2d at 613.

In the case at bar, the verdict against defendant was sufficiently supported by the evidence and the inconsistent verdicts of his codefendants have no bearing on his conviction. (*Wehmeyer*, 155 Ill. App. 3d at 944, 509 N.E.2d at 613.) Defendant was identified in court by the victim and eyewitnesses, and the trial judge and jury acted within their province as respective fact finders when they assessed the credibility of the witnesses. (See *People v. Payne* (1981), 102 Ill. App. 3d 950, 960, 429 N.E.2d 1344, 1352, *aff'd in part & rev'd in part* (1983), 98 Ill. 2d 45, 456 N.E.2d 44 ("[a] reviewing court cannot substitute its judgment of credibility for that of the trier of fact").) We cannot say how much weight the jury gave to defendant's inculpatory statement or whether, of course, he will be found guilty upon retrial absent that statement; we merely state that, on the record before us, there was sufficient evidence to support his conviction.

Based upon the foregoing, the trial court is reversed and this case is remanded for further proceedings.

Reversed and remanded.

HARTMAN and McCORMICK, JJ., concur.