THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY GARRETT, Defendant-Appellant.

First District (4th Division)    No. 1—94—1945

Opinion filed November 22, 1995.—Rehearing denied December 20, 1995.

Raymond L. Prusak, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The defendant, Anthony Garrett, appeals from his conviction for first degree murder and unlawful use of a weapon by a felon. We consider: (1) whether it was manifestly erroneous for the trial judge to deny the defendant's motion to quash arrest and suppress evidence when the police allegedly did not have probable cause to arrest; (2) whether it was plain error for the trial judge to allow evidence of the defendant's gang membership and other gang-related evidence; (3) whether it was plain error for the State to comment about gangs and gang membership in closing argument; (4) whether the cumulative effect of the trial judge's remarks to defense counsel was reversible error; and (5) whether the trial judge abused his discretion in denying the defendant's motion for a mistrial. For the following reasons, we affirm.

In the morning of October 13, 1992, seven-year-old Dantrell Davis was shot and killed as he walked to school with his mother in the Cabrini-Green housing project. After a police investigation, the defendant was arrested without a warrant and charged with two counts of first degree murder and one count of unlawful use of a weapon by a felon. Prior to trial, the defendant moved to quash his arrest and suppress his statements to the police.

In the hearing on the defendant's motion to quash and suppress, police officers testified that before the defendant was arrested on the day of the shooting they knew a witness had seen a rifle fired from the window of apartment 1001 in the 1157 North Cleveland building. That building was controlled by a certain gang. Three shell casings were found in that apartment. The shots fired from the apartment were directed at the 502 West Oak building where Davis was shot, which was controlled by a different gang. Mario Hamilton told the police that a woman named Hollywood told him that, just before the shooting, she saw a man she knew as Qarbiny carrying a rifle in the stairwell of the 1157 building on the eighth floor. Qarbiny was going up the stairs. When she reached the ground floor, she heard a shot and saw someone "go down" at the 502 building. Hollywood also described the clothes Qarbiny was wearing.

The officers knew the defendant's nickname was Qarbiny and he was the only person in the housing project with that nickname. He was the security chief of the gang that controlled the 1157 building where the shots came from and had been arrested for a previous sniping incident at the housing project. When the defendant was located at about 2:30 p.m. in front of the 1150 North Sedgwick building, he was wearing the same clothes Hollywood had described. The police could not find Hollywood and were not able to verify with Hollywood the information they received from Hamilton. In his testimony, the defendant admitted that his nickname was Qarbiny.

In ruling on the motion to quash and suppress, the trial judge found that the police officers had probable cause and therefore denied the defendant's motion. The defendant waived a jury trial on the charge of unlawful use of a weapon and demanded a jury on the charges of first degree murder.

At trial, Annette Freeman, Davis' mother, testified that on October 13, 1992, just before 9 a.m., she was walking Davis to school. When they were standing in front of the 502 building, she heard a couple of gunshots and saw sparks coming from the ninth or tenth floor of the 1157 building. Afterward, Davis was lying on the ground with a pool of blood around his head. Davis died from a single gunshot wound to the left side of the face. During an autopsy, three bullet fragments were recovered from his body.

The police officers reiterated at trial their testimony from the hearing on the motion to quash and suppress. In addition, a police officer testified at trial that when the defendant was arrested at the 1150 building, a security officer, Alberto Borges, ran up to them yelling that the defendant had been with him all day. Borges said the defendant did not do anything. Another police officer testified that the gangs that controlled the 1157 building and the 502 building were feuding at the time of the shooting and there had been sporadic shootings between the buildings since September 1992.

Borges testified that, on the day of the shooting, he was working as a security guard in the 1160 North Sedgwick building in the Cabrini-Green housing project. At about 1 p.m. on the day of the shooting, Borges saw the defendant, who told him: "I killed the kid, and I didn't mean to kill the kid." The defendant told Borges that if Borges told the police what the defendant had said, he would kill him. Later, Borges saw that the police had apprehended the defendant; because he was afraid, he told the police they had the wrong person and that defendant had been with him all day.

The morning after the defendant was taken in custody, he was read his *Miranda* rights and made a statement to the police. The de-

fendant stated that at about 9 a.m. on the day of the shooting, he went to the tenth floor of the 1157 building, where his gang kept a loaded AR-15 rifle. He went there because the rival gang had shot at some senior citizens who lived in a building the defendant's gang controlled. He had a clear view from the apartment of the 502 building which the rival gang controlled. He saw members of the rival gang standing outside the building and fired two to three rounds at them. He hit Davis. He fled from the apartment building, stopping at the eighth floor, where he gave the rifle to a young gang member who "got rid of it." When asked whether anyone ordered him to do the shooting, the defendant "referred to" Charlie Smith, the king or president of the defendant's gang.

Andrew LeFevour, a former assistant State's Attorney, testified that he met with the defendant in the police station on October 14, 1992. The defendant told him about the shooting. LeFevour prepared a written statement. The defendant read the statement, made some corrections and initialed them, and then signed each page of the statement.

The defendant's written statement was essentially the same as the oral statement previously given to the police. In his written statement, he specifically stated that he intended to shoot some members of the rival gang for revenge. He also stated that the rifle was loaded with .223-caliber ammunition.

The shell casings found in apartment 1001 of the 1157 building were .223 caliber and the ejector marks on them were consistent with being fired from an AR-15 rifle. The casings also showed that they had contained bullets with a cannelure pattern, which was the same type of pattern found on the bullet fragments removed from Davis' body. The fragments from Davis' body were also .223 caliber.

In the defense case, Javeed Syed testified that he was working with Borges as a security guard in the 1160 building on the day of the shooting. Syed did not see the defendant have a conversation with Borges after 12:45 p.m. that day. Syed denied telling Borges in January 1994 that the defendant was calling him from jail.

Torrie Farrell testified that he spoke with the defendant from about 8:30 a.m. to about 8:55 a.m. on the day of the shooting in the parking lot of the 1160 building. Farrell left and heard gunshots at about 9 a.m.

Lawrence Roberts testified that he saw Melvin Cole and the defendant on the day of the shooting between about 9 and 9:10 a.m. smoking marijuana outside the 1150 building. Roberts was not wearing a watch and he did not hear shots when he was outside that morning.

The defendant testified that he was 35 years old. He admitted that he was a long-time member of the gang but claimed he had been an inactive member since before the shooting. He had the morning shift for security for the gang and made sure that the elderly people, school children, and people going to work got to where they were going safely. He testified that in the morning of October 13, 1992, he spoke with Farrell and smoked marijuana with Cole in front of the 1150 building. He also saw Robinson. When Cole left, the defendant heard a gunshot. Defendant denied seeing Borges later in the day and denied telling Borges that he shot Davis. Defendant also denied telling Borges he would have to be his alibi or the defendant would kill him. He denied shooting Davis.

The defendant explained that he signed a statement for the police after he had been beaten twice while in custody and threatened with another beating. He said the statement was already prepared and he was not given an opportunity to read it. Defendant admitted that he signed the statement but denied that the initials at the corrections were his.

In rebuttal, a detective testified that he spoke with Roberts, who said he saw the defendant some time after 9 a.m. on the day of the shooting. Michael Krejci, a former assistant State's Attorney, testified that he spoke with Roberts, who stated that he did not see the defendant on the day of the shooting until after 9 a.m. Krejci testified that he did not discuss with Syed, Borges' partner, whether Syed received threatening phone calls from the defendant in jail. Krejci said Borges told him of the threats to Syed. Police officers testified that Farrell was a member of the defendant's gang and that gang security protected the gang's buildings and the drug operations in their buildings.

The jury found the defendant guilty of first degree murder. The trial judge found defendant guilty of unlawful use of a weapon by a felon. The defendant's post-trial motion was denied and he was sentenced to 100 years in prison. He now appeals.

OPINION

The defendant first argues that it was manifestly erroneous for the trial judge to deny his motion to quash arrest and suppress evidence because the probable cause to arrest him was based on second-hand information.

An arrest without a warrant must be supported by probable cause. (U.S. Const., amend. IV; *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) Probable cause exists when, viewing the totality of the facts and circumstances, a reasonable and

prudent person knowing what the police officer knew at the time of the arrest would believe that the defendant committed a crime. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) Mere suspicion is not sufficient to establish probable cause but proof beyond a reasonable doubt is not required. (*People v. Wilson* (1994), 260 Ill. App. 3d 364, 632 N.E.2d 114.) Also, probable cause may be supported by evidence which is inadmissible at trial, including hearsay; however, the information must have some indicia of reliability. (*People v. Hood* (1994), 262 Ill. App. 3d 171, 634 N.E.2d 404.) The issue of whether probable cause existed centers on the information available to the police before the defendant's arrest. (*People v. Adams* (1989), 131 Ill. 2d 387, 546 N.E.2d 561.) The trial judge's ruling on a motion to quash and suppress will not be reversed on appeal unless it was manifestly erroneous. *People v. Villarreal* (1992), 152 Ill. 2d 368, 604 N.E.2d 923.

The evidence presented at the motion to quash hearing established that, before the police arrested the defendant, they knew that Hollywood had seen the defendant immediately before the shooting with a rifle in his hands in the building where the shots were fired. He was headed up from the eighth floor and the shots came from the tenth floor moments later. The police knew that a witness saw a rifle shot from the tenth floor. They had discovered the vacant apartment on the tenth floor. The apartment faced the area where Davis was shot and there were shell casings on the floor. They knew that the defendant was the head of security for the gang which controlled the building from where the shots were fired and that the target of the shots, rival gang members, were in front of a building which was controlled by the rival gang. The two gangs had been involved in sporadic shooting between the two buildings for about a month before the shooting in this case. When the defendant was arrested about 5 1/2 hours later, he was wearing the clothes Hollywood described.

■ This information provided the police with probable cause to arrest because it was specific and placed the defendant very near the area where the shooting occurred with a weapon of the same type used in the shooting. The information also linked the defendant with a motive for the shooting. Although the police did not obtain the information directly from Hollywood, they were entitled to rely on hearsay information if it had some indicia of reliability. Here, that reliability was provided by the specific details that Hollywood provided which matched the circumstances of the crime: the time and location of the shooting, the type of weapon used, and the clothes the defendant was wearing.

The defendant here analogizes the present case to three cases

where the courts found the information known to the police officers at the time of arrest was insufficient to establish probable cause. See *Wilson*, 260 Ill. App. 3d 364, 632 N.E.2d 114 (holding that unverified information from a person who was not an eyewitness only provided the police with a suspicion that the defendant committed the crime); *People v. Almodovar* (1992), 235 Ill. App. 3d 144, 151-52, 601 N.E.2d 853, 857 (holding that it was insufficient to rely on an anonymous tip that "word on the street" implicated defendant in the shooting); *People v. Hollins* (1988), 169 Ill. App. 3d 304, 523 N.E.2d 1309 (holding that information from an unknown source which directly linked the defendant to the crime would not have led a reasonable person to conclude that the defendant committed the crime).

The present case is distinguishable from each of those cases. In this case, although some of the information came from a source relating hearsay, the police knew where the shots came from, they knew of the fighting between the gangs that controlled the two buildings, and they knew the defendant's nickname and his position with the gang. This information was sufficient to lead a reasonable person to conclude that the defendant committed the crime and was sufficient to establish probable cause. The trial judge's denial of the defendant's motion to quash and suppress was not manifestly erroneous.

The defendant also claims he is entitled to a new trial because gang-related evidence was improperly admitted at trial. The defendant filed a motion *in limine* to preclude the State from presenting such evidence but the trial judge did not rule on the motion because it was premature. The defendant did not obtain a ruling on the motion when the evidence was offered at trial and did not object to the admission of the testimony on the grounds that it was irrelevant or prejudicial. He raised the issue in his post-trial motion.

To preserve an issue for review, it must be raised in either a motion *in limine* or at trial and it must be raised in a post-trial motion. (*People v. Hudson* (1993), 157 Ill. 2d 401, 626 N.E.2d 161.) The movant has the responsibility to obtain a ruling on his motion to preserve an issue for appeal. (*People v. Neal* (1990), 142 Ill. 2d 140, 568 N.E.2d 808; *People v. Schmitt* (1989), 131 Ill. 2d 128, 545 N.E.2d 665.) The failure to preserve an issue for review results in a waiver of that issue on appeal. (*People v. Pasch* (1992), 152 Ill. 2d 133, 604 N.E.2d 294.) A waived issue may be considered on appeal if it amounts to plain error but the plain error rule is not a general savings clause. (*People v. Easley* (1992), 148 Ill. 2d 281, 592 N.E.2d 1036.) An issue should be considered under the plain error rule in exceptional circumstances when the evidence at trial was closely balanced or the alleged error was so prejudicial that it denied the defendant a fair trial. *Easley*, 148 Ill. 2d 281, 592 N.E.2d 1036.

In this case, because the defendant did not obtain a ruling on his motion *in limine* to preclude the State from presenting gang evidence, and because the defendant failed to object at trial when such evidence was introduced, he has waived the issue for review. This court may consider the issue if it amounts to plain error.

Evidence that the defendant was a member of a gang or participated in gang-related activity may be admissible at trial, despite its prejudicial effect, to establish a common purpose or design or to provide a motive for an otherwise inexplicable act. (*People v. Patterson* (1992), 154 Ill. 2d 414, 610 N.E.2d 16.) The evidence may only be admitted when there is sufficient proof that it is related to the crime charged. *Patterson,* 154 Ill. 2d 414, 610 N.E.2d 16.

The defendant argues the present case is identical to *Easley,* 148 Ill. 2d 281, 592 N.E.2d 1036, where the supreme court found error in admitting gang-related evidence. In *Easley,* the State presented evidence at trial that the defendant committed a murder to avenge the death of a fellow gang member. On appeal, the court found that admitting the evidence was improper because the State was unable to link the defendant to a conspiracy to kill in retaliation. Although the court found it was error, it was considered harmless because of eyewitness testimony to the murder.

■ Contrary to the defendant's claims, the present case is completely distinguishable from *Easley.* The defendant asserts that the State here failed to present evidence to support its theory that the defendant committed the shooting on orders of the leader of his gang to retaliate against a rival gang. The defendant inexplicably ignores his own statements that provided that support. The defendant provided the evidence that the shooting was motivated by retaliation for a rival gang's shooting.

Also, the present case is not similar to the recently decided case of *People v. Mason* (1995), 274 Ill. App. 3d 715, 653 N.E.2d 1371, where a conviction was reversed and remanded for further proceedings because the trial court admitted excessive, irrelevant, and inflammatory gang-related evidence. *Mason* involved the murder of a gang member by a member of the same gang. The State introduced extensive testimony about the two umbrella organizations for the gangs that operate in Chicago, the numerous gangs that operate in Chicago, the hierarchy of the defendant's gang, its drug operations, its rival gangs, how members signal each other, and the defendant's tattoos. The appellate court found that the organizational structure of the defendant's gang was relevant to prove the defendant's motive for killing a fellow gang member, but evidence related to gang rivalries, drug sales, signalling, and tattoos was not relevant to motive.

In the present case, the gang-related evidence was not excessive and was relevant to the crime and the defendant's motive. The State did not present comprehensive evidence of the gangs that operate in Chicago or other irrelevant information. In *Mason*, it was not necessary to present evidence outside the gang involved because the defendant there killed a member of the same gang. Here, the killing involved two gangs and the evidence admitted at trial related to those gangs and their rivalry. This evidence helped the jury understand the defendant's motivation for the killing and did not unduly prejudice the defendant.

The defendant admitted in his written statement to the police that his motivation for the shooting was to avenge the shooting of an elderly couple by the rival gang. He also admitted in an oral statement that the shooting was ordered by the leader of his gang. For these reasons, it was not plain error for the trial judge to admit gang-related evidence.

■ In a related argument, the defendant also claims that the State made improper gang-related comments in its closing argument because the evidence presented at trial did not establish that the crime was gang related. During trial, however, the defendant did not object to any of the comments he now claims were improper. Also, he raised the issue only generally in his post-trial motion. The failure to object at trial and raise an issue with specificity in a post-trial motion results in a waiver of that issue on appeal unless it amounts to plain error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Because it was not plain error to admit the gang-related evidence as discussed in the previous issue and because the defendant is not arguing that the argument was otherwise inflammatory, this argument does not merit review under the plain error rule.

The defendant also complains of the cumulative effect of comments the trial judge made to the defendant's counsel during three different parts of the trial: his cross-examination of former Assistant State's Attorney LeFevour, his cross-examination of Borges, and his closing argument.

The State initially contends that the defendant waived this argument by failing to object during trial to the judge's comments, although he raised the issue in his post-trial motion. The State asserts that it is necessary to object at trial to a trial judge's allegedly improper comments. The waiver rule, however, is not rigidly applied when the trial judge's conduct is the basis for the objection (*People v. Nevitt* (1990), 135 Ill. 2d 423, 553 N.E.2d 368), and the failure to object to a judge's comments at trial and in a post-trial motion does not waive the issue for review (*People v. Sprinkle* (1963), 27 Ill. 2d 398, 189 N.E.2d 295). As a result, this issue was not waived.

A defendant is entitled to a trial that is free from a trial judge's improper or prejudicial comments. (*People v. Campbell* (1992), 232 Ill. App. 3d 597, 597 N.E.2d 820.) The judge must refrain from interjecting opinions, comments, or insinuations reflecting bias toward or against any party. (*People v. Velasco* (1989), 184 Ill. App. 3d 618, 540 N.E.2d 521.) A trial judge's improper comments are reversible error if the defendant can establish that the comments were a material factor in his conviction or had a probable effect on the jury's verdict. *People v. Burrows* (1992), 148 Ill. 2d 196, 592 N.E.2d 997.

During the defendant's cross-examination of LeFevour, who prepared the defendant's written statement, the defendant asked whether an accused's corrections to a statement make it appear more believable. LeFevour agreed that corrections could make a statement more trustworthy, and he asserted that in this case the defendant requested the corrections to be made. The trial judge asked defendant's counsel: "[A]re you prepared to say that this witness is a liar? Are you going to prove it?" Shortly after, the judge stated: "If you're going to prove it, fine. I will let you ask that question. If you aren't, you're not going to infer [*sic*] it."

■ These comments were proper because counsel was implying that LeFevour was lying about the corrections. The judge was attempting to control the examination and remind counsel that he would have to subsequently present evidence to support inferences that the defendant did not make or initial the changes.

While the defendant's counsel was cross-examining Borges, he asked Borges whether he had previously testified that he told the police the defendant was a gang leader. Borges denied the claim. Counsel then immediately asked basically the same question three more times and received a denial. The trial judge stated: "He didn't say he was a gang leader, you said he said was [*sic*] a gang leader." Counsel immediately asked the question again and the judge fined him $100.

These comments were the result of counsel repeatedly asking the same question, which assumed a fact not in evidence and which received the same denial from the witness. After such repetitive questioning, the judge was entitled to limit the cross-examination to control the trial.

During the defendant's closing argument, the trial judge denied his counsel's request for five more minutes to argue. Counsel pleaded: "Your Honor, I'm arguing for my client, it's first degree murder." The trial judge responded: "Close out your argument, sir. You're wasting your time."

A trial judge is entitled to enforce the time limits he gave to both

counsel. (*People v. Trolia* (1982), 107 Ill. App. 3d 487, 437 N.E.2d 804.) Contrary to the defendant's counsel's interpretation that the judge was stating there was no purpose to further argument, it was apparent that the judge was stating that counsel was wasting the time allotted for closing argument by arguing with the judge.

Reviewing the comments that the defendant cites, it is clear that the judge was attempting to control the trial rather than disparage defense counsel. Each of the comments had a valid basis and did not display a specific bias or prejudice against defense counsel.

The defendant also contends that a mistrial should have been granted when the State did not perfect the attempted impeachment of a defense witness. During the cross-examination of Syed, the State asked him whether he had told Borges in January 1994 that the defendant had been calling him from jail. Syed had previously testified that he had not spoken with Borges since the day of the shooting. The defendant objected and the judge overruled the objection. Syed then denied that he had spoken to Borges. In rebuttal, the State called Krejci, a former assistant State's Attorney. When the defendant was cross-examining Krejci, he asked whether Syed told him that he had received threatening phone calls from the defendant in jail. Krejci responded that he did not discuss that with Syed. Defense counsel then asked: "Mr. Borges did tell you that, though, right?" Krejci responded, "Yes, sir."

A trial judge should declare a mistrial when circumstances occur of such character and magnitude that the movant was denied his right to a fair trial. (*People v. Redd* (1990), 135 Ill. 2d 252, 553 N.E.2d 316.) "A mistrial is necessary when it appears that the jury was so influenced and prejudiced that it could not have been fair and impartial and that the damaging effect could not be cured by admonitions and instructions." (*People v. Clark* (1992), 231 Ill. App. 3d 571, 574-75, 596 N.E.2d 642, 644.) The decision whether to grant a mistrial is within the trial judge's discretion. *Redd*, 135 Ill. 2d 252, 553 N.E.2d 316.

■ Here, the defendant urges that the mistrial should have been granted when the State asked Syed whether he had told Borges that the defendant had called him from jail. (See *People v. Enis* (1990), 139 Ill. 2d 264, 564 N.E.2d 1155 (holding that the State may not ask questions of a defense witness which presume facts not in evidence as a basis for subsequent impeachment unless it has admissible evidence to perfect the impeachment).) At this point, however, it was not apparent that the State would not be able to perfect the impeachment of Syed. There was no basis to grant a mistrial at this time. As it turned out later, the State did not even attempt to perfect the

impeachment during its direct examination of Krejci, but the defendant asked the question which basically perfected the impeachment. Defense counsel added the word "threatening" to the question, a term which the State did not use, and Krejci testified that that was what Borges had told him. Although the defendant now apparently complains that the response was hearsay, he brought out the testimony. The trial judge did not abuse his discretion in failing to grant a mistrial.

For the foregoing reasons, the defendant's convictions are affirmed. As a result, we grant the State's request for $100 as its costs for defending this appeal and $50 as its costs for oral argument (see 55 ILCS 5/4—2002.1(a) (West 1992)).

Affirmed.

CAHILL and S. O'BRIEN, JJ., concur.